Opinion delivered April 17, 1886.

---

[No. 3886.]

## JULY BRITT *v.* THE STATE.

1. CATTLE THEFT—BILL OF SALE—EVIDENCE—.The defense in a theft case admitted the execution of the bill of sale spoken of by the witnesses, but objected to the bill of sale itself as evidence, upon the ground that it was recorded by the county clerk in the wrong book. *Held*, that the objection was without merit.
2. SAME.—See the opinion for evidence *held*, under the circumstances of the case, to have been properly rejected.
3. SAME.—CHARGE OF THE COURT instructed the jury in a theft case that, if "they believed from the evidence that the defendant did not know that he had given or executed a bill of sale to said yearling, and that he, himself, believed at the time he sold it to Williams, that it was his own property, and that he had the right to sell it, then they should find the defendant not guilty." *Held* correct, in view of the evidence in the case, and sufficient to present the hypothesis of the defense.

APPEAL from the District Court of Freestone.   Tried below before the Hon. L. D. Bradley.

In one count the indictment charged the theft of a yearling, the property of W. W. Prude, and in another count the theft of a yearling, the property of G. A. Bell, in Freestone county, Texas, on the twentieth day of January, 1884.   A term of two years in the penitentiary was the penalty assessed by the jury.

George A. Bell was the first witness for the State.   He testified that, in 1883, he was the senior member of the law firm of Bell & Roberts, which firm had its office in Fairfield, Freestone

county, Texas. On or about September 20, 1883, the defendant applied to witness to secure the service of his firm in his defense to an indictment for the theft or embezzlement of a horse. Defendant retained the firm of Bell & Roberts in that case upon a fee of seventy-five dollars, of which twenty-five dollars was to be paid in cash. In liquidation of the cash payment, the defendant was to, and did, transfer to the said firm a certain cow and calf. Witness understood that the said cow and calf belonged to Amanda Haggard, the mother-in-law of the defendant, who agreed to aid the defendant in procuring counsel. As a matter of precaution, the witness caused the bill of sale conveying the cow and calf to be signed jointly by the defendant and the said Amanda Haggard. W. R. Boyd was present when the said bill of sale was executed, and he witnessed the same at the request of the witness. Witness thereupon, acting for his firm, took charge of the defendant's case. He procured him bail in the person of Mr. O'Neal. Mr. O'Neal took the defendant into his employ, agreeing to secure the balance of the witness's fee, which was fifty dollars. Witness saw the cow and yearling about the defendant's place at the time that the bond was signed by Mr. O'Neal. During the October following, the witness and Mr. Roberts dissolved their co-partnership, the witness buying Mr. Roberts's interest in the unpaid claims due the firm. Among the items of firm property, witness bought Mr. Roberts's interest in the said cow and calf, paying Roberts therefor in money. In December, 1883, W. W. Prude, of Corsicana, came through the country buying cattle, and witness sold him, among other cattle on the range, the cow and calf described in the bill of sale, for which Prude paid witness in money. In the spring of 1884, Prude came after the cattle, and witness went with him to gather them. Arriving in the defendant's neighborhood, it was ascertained that the defendant had sold the yearling to Andrew Williams. Defendant admitted the sale to Williams, but claimed never to have executed a bill of sale of the yearling to witness and Roberts, asserting that only his mother-in-law, Amanda Haggard, had signed the bill of sale, and that she had given the said cow and calf to him and his wife prior to the execution of the bill of sale. The cow was not found in the spring of 1883, but witness and Prude found her during the next spring. She then had a calf, which O'Neal claimed to have purchased from defendant. The witness and Prude got the cow, but not the calf.

Cross-examined, the witness stated that the fee he charged the defendant was seventy-five dollars, twenty-five of which was liquidated by an absolute conveyance of the cow and calf. The bill of sale was neither executed by the defendant and Amanda Haggard, nor received by the witness as a mortgage, nor was it designed to operate merely as a lien. Witness did not tell O'Neal that the fee due by defendant was only fifty dollars. Fifty dollars was the balance of the fee due, and O'Neal, standing good for that amount, may have understood that sum to be the fee. The witness applied to O'Neal for the fifty dollars in the fall of 1884, when O'Neal said that he had agreed to pay the fifty dollars only in the event that the defendant earned that amount, and he claimed that the defendant had earned nothing. Witness's agreement with O'Neal was a mere verbal one. He demanded of O'Neal, in 1884, a payment of twenty-five dollars, or security for the fifty dollars, and threatened to drop the case unless the matter was so arranged. O'Neal thereupon employed Mr. Gardner to defend the defendant. Witness had been paid only the cow and yearling by the defendant, and five dollars in money by Tobe O'Neal. The defendant afterwards sold the yearling. Witness did not quit the case, but remained in connection with it until it was disposed of in September, 1884. Witness did not obligate himself to clear the defendant for a fee of fifty dollars. He did tell O'Neal in the fall of 1884, that there was nothing in the case. The case was finally dismissed by the State. Witness told Etheridge that he had paid Prude for the yearling, and then thought that he had given Prude another for it. Reflection, however, and an interview with Mr. Prude, had convinced witness that he was mistaken in the statement to Etheridge. Witness never had other than constructive possession of the cow and yearling. Defendant promised to drive the cow and yearling to the witness after his release on bond, but failed to do so. Witness denied that he ever told O'Neal, either directly or inferentially, that the bill of sale was to operate as a lien on the cattle.

W. W. Prude testified, for the State, that among other cattle he bought on the range from G. A. Bell, were the cow and yearling Bell got from defendant and Amanda Haggard. The bill of sale from Haggard and defendant to Bell & Roberts was assigned to witness, who had it recorded. Witness lost the original bill of sale on his way home. Bell went with witness after the cow and yearling in the spring of 1884. Defendant was

found on O'Neal's place, but the animals were not found.  Defendant at that time said that he had sold the yearling to Andrew Williams.  He refused to point the cow out to witness and Bell, and she could not be found.  Defendant denied that he had ever executed a bill of sale conveying either the cow or the yearling.  Witness then went to see Andrew Williams, who said that he bought the yearling from the defendant.  Witness and Bell went after the cow again in the fall of 1884, Bell stopping over night at W. C. Lane's house, and witness going on to O'Neal's, where he stayed over night.  Witness then ascertained that the cow had borne a calf, which the defendant claimed to have sold to O'Neal, and O'Neal claimed to have purchased it from the defendant.  On the next morning the witness found the cow, but did not find the calf.  O'Neal said that he would not surrender the calf.  Defendant still denied that he executed a bill of sale to Bell & Roberts, conveying the cow and yearling, but the witness drove the cow off.  The yearling was taken without witness's consent.

Andrew Williams testified, for the State, that the defendant sold him the yearling in question early in 1884, for seven dollars and a half.  On the day before the purchase of the yearling the defendant told the witness that he had to sell the yearling to get money to pay Mr. Bell; that unless paid, Mr. Bell would abandon his case.  He told witness that if witness would buy the yearling he would get it up next morning.  Witness told him to get up the yearling for his inspection on the morrow.  Witness went on the next morning, and found that defendant had penned the yearling at the Will Gorman place.  Witness agreed to pay seven dollars and a half for the yearling, delivered at the Sam Gorman place.  Arriving at the Sam Gorman place, witness tendered defendant a twenty dollar bill, which the defendant could not change.  It was then agreed that if witness did not see the defendant in town, on the next day, he was to pay the seven dollars and a half to Mr. Bell.  Witness, however, met defendant in town on the next day, and paid him the money, and defendant went with it direct to Bell's office.  Witness sold that yearling to McCrery & Bradley.  Prude came to witness and demanded pay for the yearling.  He, Prude, said he would have pay for it if he had to spend three times its value getting it.  Witness retorted that he would spend five times its value before he would pay for the animal the second time.

R. G. Hatcher testified, for the State, that during the first

week of the present term of court he had a conversation with the defendant about this case. Defendant claimed in that conversation that he had never executed a bill of sale conveying the cow and yearling to Bell & Roberts. He denied that he had ever executed a mortgage, or other writing, upon the animals. Witness was with Mr. Bell when Bell was in defendant's neighborhood getting sureties on defendant's bond, and when the cow and yearling were pointed out to Bell.

W. R. Boyd testified, for the State, that on or about September 20, 1883, G. A. Bell and defendant came to witness's office, and the witness attested a bill of sale executed by defendant to Bell. Defendant acknowledged the execution of the bill of sale, and his signature thereto. Witness did not remember whether or not the bill of sale was read over to the defendant in his, witness's, presence.

Jesse Davis testified, for the State, that he was present and saw defendant and Amanda Haggard sign the bill of sale conveying the cow and yearling to Mr. Bell. The cow belonged to Amanda. Bell spoke to witness about driving the cow and yearling to Fairfield for him. Defendant was present, and made no objection. Witness did not drive the cow for Mr. Bell.

Cross-examined, witness said that the instrument executed by defendant and Amanda Haggard was a mortgage. Re-examined, he said that it was a bill of sale. Asked the question, he said that he did not know the difference between a mortgage and a bill of sale, and knew nothing more about the transaction than that Amanda gave Bell the cow and yearling to defend the defendant.

The State next read in evidence, from the records of Freestone county, the record of the bill of sale signed by defendant and Amanda Haggard conveying the cow and yearling to Bell & Roberts. State closed.

Andrew Williams testified, for the defense, that some time after he purchased the yearling from defendant, Mr. Bell approached him about the transaction and demanded pay for the animal. Witness told Bell that he had paid defendant seven dollars and fifty cents for the yearling, and asked Bell if defendant did not pay him the money. Mr. Bell replied: "No; the trifling rascal paid me only five dollars." Bell several times claimed pay of witness for the yearling.

Cross-examined, the witness said that he could not locate the exact time of his first interview with Bell about the yearling, ex-

cept that it occurred between the spring and fall of 1884. Being pressed by the State, the witness admitted that the interview with Bell occurred within a month after the purchase of the animal. Being further pressed, he was unable to testify positively that Bell said he got five dollars of the money from defendant.

R. R. O'Neal testified, for the defense, that defendant lived on his place in 1884 and 1885, and part of the year 1883. Bell often talked to witness about his transaction with the defendant in regard to the cow and yearling, and always spoke of the alleged bill of sale as merely a mortgage or lien on the animals. Bell once asked witness for twenty-five dollars on his fee, and witness advised him to sell the cow and yearling and get the twenty-five dollars. Bell replied that if he sold the cow and yearling for twenty-five dollars he would have no security for the other twenty-five dollars left. During the fall of 1884, Bell told witness that unless he, witness, paid him twenty-five dollars he would quit the defendant's case. Witness told him "all right," and that he would employ Gardner. Witness then went to B. H. Gardner's office and employed him, and told defendant on that same day that he was no longer liable to Bell, as Bell had quit the case. If Bell ever did anything in the case after Gardner took charge of it, witness did not know it.

Cross-examined, the witness testified that Andrew Williams first told him of the purchase and sale of the yearling in question. He had never heard the defendant say anything about selling the yearling, but had often heard him deny that he had ever executed a bill of sale to Bell. Witness heard of the bill of sale only through Bell. The only advice witness had ever given the defendant was given after the talk with Bell when Bell threatened to quit the case unless paid, or his fee secured. Witness then told the defendant that Bell had quit his case, and that he, witness, did not consider him, defendant, longer liable to Bell for the fee. That was just before the September term, 1884, when the case was dismissed. Bell tried several times to sell the Amanda Haggard cow to the witness. Witness got the calf of that cow, and refused to surrender it to Mr. Prude. Defense closed.

G. A. Bell testified, for the State, in rebuttal, that he tried several times, in 1884, to sell the cow to O'Neal and other parties. He did so at Prude's request. Witness had one or more talks with Andrew Williams about the yearling, but he never, at any

time, told Williams that defendant paid him five dollars of the money paid him, defendant, by Williams. As a matter of fact defendant never, at any time, paid witness any sum of money on the fee, but Tobe O'Neal paid witness five dollars for the defendant. Witness produced his account book which showed an entry against defendant for services in the district court for seventy-five dollars. and credits of twenty-five dollars for a cow and calf, and five dollars in cash paid by Tobe O'Neal. He produced also a note for fifty dollars, signed by the defendant and witnessed by T. W. Sims.

The defendant's second bill of exceptions presents the excluded evidence referred to in the second head note of this report, as follows: The defendant proposed to prove by W. C. Lane, that he, Lane, was a justice of the peace, and resided near the place of the defendant's residence; that when Bell and Prude came after the cow and yearling, the defendant came to witness, claiming that Bell had quit the case, and therefore, had no claim on his cattle, and no right to take them away; and that defendant asked him to protect his cattle by legal means.

The motion for new trial raised the question discussed in the opinion.

*A. G. Anderson* and *F. M. Etheridge,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for the theft of a yearling, the property of W. W. Prude, or G. A. Bell.

The first assignment is that "the court erred in not excluding upon motion of defendant a certain bill of sale," etc. There is nothing in this assignment. It appears that the bill of sale was recorded in the wrong book, and the motion to exclude it was upon this ground; but it also appears that when the State proposed to prove its contents and execution, defendant admitted that he had given the bill of sale referred to by the witnesses. Under these facts the court very properly refused to exclude it.

Andrew Williams was a witness. and it appears that there was some conflict between his testimony and that of Mr. Bell. This being the case, defendant proposed to prove his good character for truth and veracity. Upon objection of the district attorney, this was refused. It appears that the matters and facts in relation to which these witnesses differed, occurred some

time after the theft; and it is also clear that these facts about which the witnesses differed did not have the least bearing upon the material facts of the case. Some time before the transaction between Williams and Bell occurred, appellant had sold to Williams the yearling and received pay therefor. Whether he paid Bell any part of this sum could not affect the question; for, if guilty at all, this transaction could not affect the case. Nor would the fact that Bell received a part of this money alter the case in the least when considered with relation to the other facts. Under this state of case, we are of the opinion that there was no error in rejecting the proposed proof.

We notice the assignments in the order presented by the brief. The second error assigned is: "That the court erred in the fifth paragraph of the charge." The substance of this paragraph is, that if the jury believed from the evidence that defendant *did not* know that he had given or executed a bill of sale to said yearling, and that he, himself, believed at the time that he sold it to Williams that it was his own property, and that he had the right to sell it, then he would not be guilty.

We cannot perceive any objections which appellant could present to this charge. It was made pertinent by the evidence, and is an appropriate charge, presenting the theory of the defense clearly.

We have considered and determined all the points presented by the brief of counsel for appellant, but we have not confined our investigation alone to the errors assigned.

After a very careful examination of the record, we find no such error as requires a reversal of the judgment, and it is affirmed.

*Affirmed.*