### EUGENE FAULKNER v. THE STATE.

#### No. 2465.   Decided December 4, 1901.

**1.—Change of Venue..**

On the hearing of defendant's motion to change the venue, on a prosecution for murder, it was error for the court to refuse to hear further testimony on the ground that no prejudice existed, where it was shown that on previous separate trials two of defendant's codefendants had been each convicted and that the testimony elicited on their trials had been published in the county papers and thus extensively circulated throughout the county; and forty-three witnesses of almost every vocation had testified that, in the opinion of citizens with whom they had conferred, defendant was guilty; some thinking that he ought to be hanged and others that he ought to be burned; and when the State introduced no evidence controverting this testimony.   What the court may have heard, on motion for change of venue in the previous trials of defendant's two codefendants, could afford no reason for the action of the court in the case.

**2.—Same—"Prejudice"—Prejudgment.**

On a motion for change of venue, "prejudice" and "prejudgment" of the case mean the same thing; that is, when one has prejudged a person's guilt of the accusation against him, he has a prejudice against such person, and especially may this be so in a case of startling atrocity so horrible as to engender a personal prejudice against the person accused of its perpetration.

3.—Murder—Experiment—Spectacular Evidence.

On a trial for murder by pouring turpentine over deceased and then setting fire to his clothing, it was error to permit a piece of woolen goods to be soaked with turpentine and then set on fire, and in the presence of the jury attempt to put it out. This was not experiment evidence testified to by witnesses, but a spectacular exhibition before the jury, and as such was not admissible.

4.—Same—Impeachment of Witness—Contract of Two Defendants to Turn State's Evidence—Charge.

On a trial for murder, where two codefendants had made a contract to turn State's evidence, and one of them had testified and the other had not, and defendant introduced said contract for the purpose of impeaching the one who had testified, it was error for the court to assume that defendant had introduced the contract as the original testimony of both parties against himself.

5.—Same—Hearsay Evidence—Withdrawal of.

On a trial for murder by a saloon keeper for purposes of robbery, the testimony of a police officer to the effect that when a man is robbed in one of the dives in "the south end," and the proprietor is indicted for robbing him, "they always prove the man had no money," was purely hearsay, and its withdrawal by the court could not cure the error of its admission.

6.—Same—Declarations of Deceased.

On a trial for murder, the declarations by deceased several hours after he had been burned, in answer to questions calculated to elicit his statement, to the effect that one of the pieces of money taken from him was a nickel with a hole in it, was inadmissible as part of the res gestae.

7.—Same—Evidence—Disguise of Codefendant.

On a trial for murder it was inadmissible to prove that a codefendant had, for purposes of disguising himself, changed the color of his mustache from a brown color, on the night of the homicide, to that of black at the trial, it being testimony as to a matter transpiring long after any conspiracy may have existed between the parties.

8.—Same—Evidence.

On a trial for murder, it was incompetent and inadmissible to prove by the wife of deceased the number and ages of her children by deceased.

9.—Same.

On a trial for murder it is not competent to prove by the county attorney that, at the time he made a contract with one of defendants to turn State's evidence, he told such defendant that the contract would be forfeited if he implicated or brought in any innocent man.

10.—Declaration of Bystander.

On a trial for murder, it is not competent to prove by a witness that as he ran over to the saloon he heard some one, he does not know who, saying, "There is a man burning up in there, and they set him afire, too." It was hearsay, and not res gestae nor a declaration by participants.

11.—Same—Declarations and Statements of Codefendant.

It is incompetent to prove against defendant the declarations and statements of a codefendant, and statements of a codefendant made in the absence of defendant and long after the alleged conspiracy between the parties had transpired.

12.—Same—Principals—Charge of Court.

On a trial for murder where several parties were implicated, and which occurred in saloon of defendant, it was error for the court, in the charge as to principals, to so interpolate defendants ownership of the saloon as to cause the jury to regard as evidence, or presumptive evidence on the part of appellant, that some one had committed the crime (setting deceased on fire); and it was further error, contradictory and misleading, to instruct the jury to convict defendant as a principal if he participated in the act, and to convict him whether he participated or not.

**13.—Same.**

If defendant conspired with others to pour the turpentine on deceased and then set fire to and burn him, he would be guilty though he was in the front part of the saloon at the time; or if he did not so conspire with others to burn deceased, but was present and knew that others were engaged in the crime, and he aided by acts, words, or gestures in anywise, he would be equally guilty with those who set fire to deceased. On the contrary, if he only engaged with others to turpentine deceased, and without his knowledge or consent some one else set fire to and burned deceased to death, then he would not be guilty. And these principles of law should have been presented in the charge to the jury in clear and distinct phraseology.

Appeal from the Criminal District Court of Dallas. Tried below before Hon. Chas. F. Clint.

Appeal from a conviction of murder in the first degree; penalty, death.

The indictment contained seven counts charging defendant alone, and as a principal aiding and encouraging and abetting John Chapman, W. M. Reuner, Will Pruitt, and Drew Pruitt, with the murder of C. P. Bane, on the 3d day of December, 1900, by burning him to death with fire, and by destroying his life by pouring turpentine over his clothing and setting him on fire, and thereby causing his death.

The opinion contains a very clear though concise statement of the material facts attendant upon the murder as shown by the record, and no further statement is required. The errors discussed in the opinion are also sufficiently shown in the statement of the same in the opinion.

*Miller & Fouraker,* for appellant, as to error in the ruling of the court on the motion to change the venue, cited Randle v. State, 34 Texas Criminal Reports, 43.

As to the error of the court in regard to the selection of the jury, they cited Blocker v. State, 61 Southwestern Reporter, 391.

The portions of the judge's charge found in and complained of in bills of exceptions numbers 7 and 8, lay down a doctrine so new, so contrary to the correct legal principles contained in the language of the statutes, that it seems to us an unnecessary consumption of time to present argument or authority in support of the proposition that these portions of the charge found in the bills are misleading and upon the weight of evidence. The court told the jury in the first portion of his charge what constitutes a principal, and as long as he adheres to statutory definitions he correctly states the law, but when he comes to apply these statutory definitions to the facts of this case, and to explain to the jury those conditions upon which they would be justified in finding the appellant to have been a principal, we find a new element incorporated,— the element of ownership. That appellant was one of the owners of the place where this unfortunate homicide occurred was a conceded proposition, and now the jury are told by the court that ownership is to be considered by them, and that if this appellant was an owner of said place, "then he would be guilty as a principal of murder in the first degree by torture, whether he participated in said act or not, and whether it was intended to kill the said Bane or not, or whether the said Bane

had been robbed or not, and without reference to what the unlawful intent of setting said Bane on fire may have been, you should so find and frame your verdict as above directed." In other words, strip these portions of the charge complained of in bills of exceptions numbers 7 and 8 of all cumbersome verbiage, and you have the startling proposition that ownership, knowledge, and presence are sufficient to make a man a principal in a crime for which the penalty is death. It is often harder to make an argument upon a proposition the mere statement of which carries its own contradiction, than upon a close question. This charge is so at variance with justice, with the statutes defining principles, with the decisions which without exception have held that it required both combination of act and intent to make a man a principal, that it seems to us the mere statement of the error should be sufficient to reverse the case. Upon what theory of the law the court predicated his charge that ownership was an element to be considered by the jury it is hard for us to understand, and yet we are told that ownership and presence coupled with knowledge are sufficient to charge an unfortunate owner with malice that might exist in the breasts of others, of which he had absolutely no suspicion; sufficient to make him responsible for conduct in which he was not a participant; for murder of which he might have been an unfortunate spectator; a doctrine which, if carried to its logical conclusion, would make it unsafe for the citizen to indulge in the ownership of property, unless he safely guards it against the intrusion of all men. It is true that the jury are told that they must find that the "defendant was acting as a principal as aforesaid," intending, I presume, to refer the jury back to the court's definition of principals as found in the first portion of his charge, but there the jury find nothing that would justify them in considering the question of ownership; here they are told that ownership is the most material thing to be considered. Which shall they follow? Naturally that portion of the charge which is applying the law to the facts, fixing their duty as to the verdict they shall render, and the definition, instead of being an aid to the jury, only misleads them the more. This court has already determined, in a case from Stephens County, that the defendant can not be made responsible for the malice of another, of which he does not know the existence, and it is equally as well settled a proposition of law that to constitute one a principal in the commission of a crime there must be a combination of both act and intent in the commission of the crime. There must be a knowledge of the unlawful intent and an acting together. Beginning with Guffee v. State, 8 Texas Criminal Appeals, 187, and running through almost every volume of the Reports, including Trimble v. State, 33 Texas Criminal Reports, 397, this fundamental doctrine of the law of principals has been adhered to, and the foundations of the criminal law of this State must be overturned before this surprisingly new doctrine can be laid down as the law, that ownership, presence, and knowledge are sufficient to constitute a principal in crime.

As the law of this case, perhaps not stated as fully as it might have

been, but certainly with sufficient fullness to have directed the court to his errors complained of in the said bills of exceptions numbers 7 and 8, defendant at the proper time requested the court to charge the jury as found in his bill of exceptions number 9, as follows: "You are instructed that unless you find by legal and competent evidence, and beyond a reasonable doubt, that the defendant, Eugene Faulkner, was present at the time C. P. Bane was set on fire, and with knowledge of the intention to set him afire, participated in such act by word or deed, you will acquit the defendant, even though he was present and consented to the pouring of the turpentine upon the person of the said Bane." And in bill of exceptions number 14, which requested charge read as follows: "The mere presence of the defendant at the time and place of the commission of the offense, if you find beyond a reasonable doubt that such an offense was committed, or a failure on the defendant's part to prevent the same, or a mere knowledge that such an offense is about to be committed, will not constitute the defendant a principal in such an offense."

The two special instructions were refused, and the jury left to measure the principalship of this appellant upon the issue of ownership.

Appellant's bill of exceptions number 17 complains of as palpable an overruling of that fundamental right guaranteed to every defendant, both by the Federal Constitution and our own Bill of Rights (article 1, section 10), that in every criminal case the defendant shall have the right "to be confronted with the witnesses against him," as ever occurred in any court of justice. The bill sets forth at length that which may be succinctly stated as follows: Drew and Will Pruitt were among the defendants charged conjointly with this appellant with the commission of this homicide. The State entered into a contract with them by the terms of which they turned State's evidence, and in return they were to be released. Not willing to trust these men, the State incorporated in the written contract set out in this bill of exceptions the testimony which these witnesses agreed would be their evidence upon the trial. In preparing the contract and statement it was made a joint instrument, and the testimony of the two witnesses set out jointly, so that it was impossible to read one without reading the other. The State placed Will Pruitt upon the stand. Upon the trial of this appellant, when it had concluded its examination in chief, appellant's counsel, believing that there was fundamental variance between the testimony of the witness upon the stand and his agreed testimony in his contract with the State, by permission of the court read this statement made and signed by him to the jury, prior to the cross-examining of the witness Will Pruitt. This was done after a statement made to the court and jury, that counsel desired the jury to hear this written contract and testimony in order that they might the better understand the cross-examination of the witness. Owing to the nature of the instrument, as before stated, in reading this it showed that it was also the statement of Drew Pruitt, but was only

read as the statement of Will Pruitt. This was the only pretension that Drew Pruitt was ever a witness in this case. He was never upon the witness stand, never faced appellant, or afforded his counsel an opportunity for cross-examination, and yet, as shown by this bill of exception, and the charge of the court, upon this condition of fact the court charged the jury as follows: "If you believe from the evidence beyond a reasonable doubt that C. P. Bane was murdered as charged, but have a reasonable doubt as to whether Drew Pruitt was an accomplice to the crime, as that term has been explained to you, then you are told that you can not look to his testimony for any purpose against this defendant unless the same is corroborated by other evidence." Here the jury are told that Drew Pruitt did testify in the case; if he did, then he testi-- fied by deposition. How important this error is, it is hardly necessary to point out. It gave the State the benefit of a corroborating witness to the only other eyewitness who testified in the case, Will Pruitt, a confessed accomplice. How jealously the Supreme Court of the United States and this honorable court have guarded this constitutional privilege of a defendant is too well known to every member of this court to need citation of authority to impress it upon you. So flagrant is this violation of the principle that we deem a citation of the Constitution sufficient authority. But, says the honorable trial court in his explanation of this bill, it may be true this witness never testified, he never confronted appellant, he was never subjected to cross-examination, but the State tendered him to the defendant and offered to let him put him upon the witness stand. With a rope around his neck, with a written contract bearing his signature, that meant for him if he violated its terms a conviction of murder in the first degree. What a farce to undertake to evade this gross violation of fundamental law by such a petty subterfuge.

More for the purpose of calling the court's attention to the method by which this appellant's conviction was sought than in hope of it being considered sufficient ground for reversal, appellant calls the court's attention to his bill of exceptions number 18, complaining of the action of the court in permitting one Robert Cornwall, an ex-police officer, placed upon the stand as witness for appellant, to be asked the following question: "Did you not know from your experience as a police officer that when a man is robbed in one of the dives in the 'South End,' and the proprietor is indicted for robbing him, that they always prove the man had no money?" To which question appellant objected. The reasons for his objection could be given by a Hottentot within whose breast has been born a spark of common justice. The appellant had proved by the witness Cornwall, in answer to the State's contention that deceased had been robbed and then burned to conceal the crime; the witness whom they did not attempt to impeach had testified to a set of facts which showed this contention to be without foundation, and the answer to his testimony is the unfair, illegal question set out above; and the objection being overruled the witness answered, "Yes, sir." The special counsel

who opened the prosecution commented at length upon the force of this testimony against the defendant; the county attorney who followed him did the same. Only after the last speech had been made for this appellant, and before the closing argument for prosecution had been concluded, in order that the special counsel who closed the case might have an opportunity to break the force of the concession, did the court withdraw this testimony from the jury and bid them not consider it. I know the books are full of cases holding that an error of this character, healed by withdrawing the objectionable evidence from the jury, has been held not sufficient ground for reversal. I have never believed that these decisions were founded in sound judgment or fair dealing, but I defy the research of counsel for the State to show in all the books as flagrant a violation of primary principles of the law, sought to be cured in this impossible manner, as is presented by this bill of exceptions.

Appellant's bill of exceptions number 19 raises the question of the admissibility of certain statements made by deceased after the burning admitted by the lower court as res gestae. Conceding that time is not an element to be considered in passing upon the admissibility of testimony under this rule, and believing that the logical deduction of various cases on this subject leads to the conclusion that each case of this character practically stands upon its own bottom, we yet believe there is one rule universally adhered to, that to be admissible the testimony must at least speak with spontaneity that shows it is not the result of deliberation. Measured by this rule, we do not think this testimony should have been admitted. The condition of the deceased at the time, the amount of morphine which had been administered to him, his mental condition as evidenced by the statement itself,—all, in our judgment, would lead a fair and impartial mind to reject this testimony as being of too questionable a character upon which to jeopardize the liberty or the life of the humblest citizen.

Bills of exceptions numbers 20, 21 and 23 each present questions of irrelevant testimony, and while we shall briefly present all three of them separately, in support of our position upon them all, and the effect that should be given by an upper court to that admission of irrelevant testimony, we cite your honors to a careful consideration of United States v. Bird, 180 United States Supreme Court, delivered at the October term, 1900. The testimony complained of in the first bill complains of certain questions asked by the State, of their star witness, the self-confessed accomplice, Will Pruitt. We quote the questions and answers in full:

Q. "What was the color of Bill Renner's mustache on the night Pate Bane was burned?" (Renner was one of the defendants jointly indicted with this appellant, and whose case had been tried and disposed of two weeks prior to this appellant's trial.) To which question defendant objected, and his objection being overruled, the witness answered:

A. "What I call a light brown; about the color of that gentleman's mustache there."

Whereupon the State asked the witness the following question:

Q. "Did you see Bill Renner when he was being tried after that?"

A. "Yes, sir."

Q. "What was the color of his mustache then?"

A. "It was black."

What relevancy did this testimony have to the case on trial? Did it shed any light upon the question of this appellant's connection with the alleged homicide, or did it undertake to show that Renner, one of this appellant's codefendants, upon the trial of his (Renner's) case, had dyed his mustache, probably for the purpose of affecting the question of his identification? Appellant and Renner had both been in jail for months and appellant was not present at the time of Renner's trial, the records showing that they were tried severally, and could not be morally nor legally responsible for the dyeing of Renner's mustache. Its admission could only have been used to prejudice the minds of the jury against the appellant by the use of evidence absolutely irrelevant under any rule of law that could be possibly suggested. Bill of exceptions number 21 complains of like immaterial and irrelevant testimony, whose purpose and effect could only have been to have more inflamed the prejudice that might exist against appellant. Mrs. Bane, the widow of deceased, was brought upon the witness stand to confront the jury, in all her sable robes, and asked how many children she had, and over appellant's objection permitted to answer six; and what their ages were, and again over appellant's objection permitted to state that they ranged from 12 down to 6. Mrs. Bane, as this record shows, was probably twenty miles away when the homicide occurred. She knew no fact that cast any light upon the grave issue involving the life of a citizen, but she was permitted to parade her grief and let the jury in their imagination see a desolate home, around whose hearthstone there grouped six orphan children; and this in a court of justice sitting to administer the law to punish the guilty, to protect the innocent. Surely the waves of passion and prejudice must have reached even beyond the doors of the courtroom.

Bill of exceptions number 23 complains of a yet more dangerous piece of illegal testimony. J. D. Brannan, a witness for the State, was permitted over appellant's objection to testify that as he (Brannan) ran into the saloon where deceased was then on fire, that he met a young man on the outside who said, "There is a man on fire in there, and they set him on fire, too." Brannan did not know this young man; he was never placed upon the witness stand. And yet this unknown is permitted to give one of the most important pieces of testimony found in the record. When you consider that so far as actual commission of the crime is concerned the State is relying for its testimony upon the accomplice witness, Will Pruitt, whose testimony must be corroborated, and here is corroboration,—it did not seem to matter upon the trial of this cause that it was corroboration by hearsay, it was corroboration, and a conviction must be had.

Again, in conclusion of our presentation of these three foregoing bills, we earnestly invite the court's serious consideration of the opinion of the Supreme Court of the United States, cited above.

Appellant's bill of exceptions number 3 will also be submitted to the court without any citation of authorities, because in our humble judgment the like of this farce was never known in a court of justice before. The State had proven that turpentine would burn; that woolen cloth saturated with turpentine was a highly inflammable substance. But the State was not satisfied with this; Colonel Russell, one of the special counsel for the State, with indescribable dramatic effect, in the presence of the jury, took a piece of woolen cloth, and, saturating it from a bottle which he told the jury contained turpentine, he proceeded to set the same on fire, and called upon his cospecial counsel, Judge Muse, to put it out; and as the blue flames shot upward and the long colonel stood like Nemesis, pointing to the flames with bony finger extended, Muse jumped around like a "sick cat on a hot griddle" pretending to stamp it out. Only a kinetoscope to the weird accompaniment of rolling thunder and flashing lightning, and the other accessories of the ordinary blood and thunder drama, could faintly portray this unconscionable effort to inflame the minds, cloud the judgment, and sear the conscience of the "fair and impartial men" who held in their hands the life of this appellant. Surely this court, standing far above the reach of public clamor, of unthinking prejudice, or unreasoning hate, will not lend its countenance to such questionable practice.

In conclusion, we desire again to sincerely assure the court that the presentation in this brief of the bills of exceptions herein commented upon is not intended as a waiver of the others found in the record, or lack of confidence upon our part that they, too, are well founded.

What answer will the State make to this record, bristling with errors? Will it say they are immaterial, because the facts show the defendant to be guilty, and therefore he suffered no injury thereby? Who can say this truthfully? How much did these errors contribute to the infliction upon this appellant of the highest penalty known to the law? Only the Infinite can answer. What effect did they have towards closing the minds of the jurors to the evidence of Dunn and Donovan, disinterested witnesses; men who were not personally acquainted with appellant; men who, however badly they have stood the "bulldozing" cross-examination of distinguished special prosecutors, could not be assailed from the standpoint of good reputation; whose evidence shows that this appellant was not present in the back part of the saloon where this unfortunate homicide occurred, and could not have played the leading part therein attributed to him by the accomplice, Pruitt? In this connection let us call your attention to the fact that the record discloses that the Pruitts were blood cousins, in the first degree, of the defendant Chapman, whom we contend they were seeking to screen as much as was consistent with their own safety, at the expense of the stranger, Faulkner; and as the trial judge, in his qualification of this appellant's bill of exceptions num-

ber 1, has seen proper to refer to what occurred upon the trial of this appellant's codefendant's case, it would not seem inappropriate for us to suggest that the testimony of one of them, Renner, in his own behalf, when it could do him no good, corroborated the testimony of Dunn and Donovan exonerating this appellant, and placed upon Chapman the part the Pruitts ascribed to appellant.

But guilty or not guilty he was entitled to have been tried by the rules of law,—to have the constitutional rights guaranteed to every citizen. But this record discloses that appellant was put to trial in a county where passion and prejudice had prejudged his cause and blind obedience to public clamor stood ready to write the verdict; a fair and impartial jury denied him,—at least to the extent of requiring him to exhaust his peremptory challenges,—but men whose determination was fixed as to the penalty they would impose upon him; his constitutional right to be confronted by the witnesses against him denied, and illegal and immaterial evidence calculated only to arouse the passion of the jury admitted against him. Were he as guilty as Cain, his conviction under such condition would be judicial murder.

He brought his case to this court, confident that here the law without bias, free from prejudice, will be administered to him, and therefore submits it with unquestionable confidence that this cause will be reversed and remanded.

*J. C. Muse, Stilwell H. Russell,* and *Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

The facts of the case show that between 11 and 12 o'clock on the night of December 3, 1900, deceased, C. P. Bane, was in the saloon of Chapman & Faulkner, situated on the southeast corner of Elm and Preston streets, in the city of Dallas. He was in an intoxicated condition. At the particular time he was in the rear room of said saloon, which was partially cut off by a screen from the front room, where the bar was situated. He was sitting by a stove, in a bent position, evidently asleep, or in a state of stupor. Turpentine was poured on his back by appellant, or by those with whom he was engaged, and some one set fire to the clothing of deceased, and the fire at once spread over his person, the flames shooting up two or three feet above his head. He rushed from the rear of the saloon to the front, enveloped in a sheet of fire. His clothes were almost entirely consumed. He either fell on the floor or was thrown down in an attempt by some one to put out the fire. He was shown to have suffered great agony and pain. In a short time he was removed from the saloon to the city hospital, where he lingered for a few hours, expiring from the effects of the burns he had received. We understand this to be uncontroverted. The theory of the State was that appellant and his partner, Chapman, Renner, and possibly the two Pruitts, acting

together,—the first two out of motives of robbery, and all of them in a spirit of diabolism,—poured turpentine on deceased, and appellant set fire to him. The theory of defendant was that the turpentine was poured on deceased, not for the purpose of killing him, but for amusement, and that it was not designed to burn him, and that some one set deceased afire while he (defendant) was not present, and without his knowledge or consent.

Appellant made a motion to change the venue on the ground that so great a prejudice existed against him as that he could not expect a fair trial. This was supported by his own affidavit and that of M. A. Rawlins and T. M. Barnard. The State controverted this by the affidavit of J. Roll Johnson, sheriff of Dallas County, who, in effect, stated that appellant's compurgators were obscure persons, and their acquaintance in said county was limited; and that said compurgators were friends of defendant and his associates, and on that account they were biased in favor of defendant; and said defendant could procure a fair and impartial jury in Dallas County. On the trial of this motion appellant introduced forty-three witnesses, a great majority of whom lived in the city of Dallas and Oak Cliff. Some, however, lived in other portions of the county. These were shown to be of almost every vocation,—ministers, merchants, lawyers, farmers, physicians, newspaper men,—and it was shown by them that their acquaintance was extensive throughout the county, that they had conversations with a great many persons, and heard expressions in regard to the burning of Bane by defendant and his confederates, and that all the expressions heard by them were to the effect that defendant was guilty. Some said he ought to be hanged, and some that he ought to be burned. A majority of these witnesses stated that they had formed an opinion as to the guilt of appellant, but that they believed they could give appellant a fair trial, and they believed that he could get a fair trial in Dallas County. However, some admitted that they had formed opinions in regard to appellant's guilt, which were fixed, and that they did not believe he could get a fair trial in the county. In connection with this it was shown that the trials of Renner and Chapman had preceded the trial of appellant, and that the newspapers (including the Dallas News, Times-Herald, and Garland News) had published some or all of the testimony in the cases. The circulation of these papers was shown to have been extensive throughout the county. In addition it was shown that in the trial of said two preceding cases a special venire was chosen, and evidently through this, as well as through the newspapers, the case against appellant became notorious throughout the county. It appears from the bill of exceptions that after forty-three witnesses had been produced by appellant, and testified as to the prejudice against him, the court refused to hear any further testimony from him, and none was introduced by the State in contravention of the evidence of appellant's witnesses. The court says that all or nearly all the witnesses introduced by appellant were from the city, and that their evidence

showed that no prejudice existed. In addition the court states he had heard over one hundred witnesses in the Chapman and Renner cases on like motions, many of whom were from the country, before hearing this motion, and over seventy of them qualified and about ninety disqualified as jurors, and but one in all the cases believed or heard of any prejudice. Why the court interpolated this explanation as to the motions for a change of venue in the other cases, and as to what they said is not stated. Certainly, what said parties stated in other cases was not evidence in this case; and, if these were some of the witnesses appellant proposed to introduce, certainly their testimony should have been admitted. Moreover, it is stated in said explanation that ninety of one and sixty men from the country were disqualified. The grounds upon which they disqualified is not stated. However, the court remarks "that but one in all the cases believed or heard of any prejudice." What the court terms "prejudice" means is not stated, but we may gather from his previous statement to the effect that the witnesses who had been introduced all showed that no prejudice existed against appellant that he means by this that when a person has formed an opinion that defendant is guilty, and that he ought to be burned or hanged, and that these were the universal expressions he had heard in regard to defendant and the case, that this is not such prejudice as ought to operate to change the venue. Now, it has been held by this court, since Randle's case, 34 Texas Criminal Reports, 43, that "prejudice" and "prejudgment" mean the same thing; that is, when one has prejudged a person's guilt of the accusation charged against him, that he has a prejudice against such person. In Meyers v. State, 39 Texas Criminal Reports, 500, the same doctrine was announced. The writer of this opinion, however, upon this proposition, differed with the majority of the court in the Meyers case, believing that the mere formation of an opinion in the case did not involve a prejudice against defendant, which, according to the ordinary definition of the term, must carry with it some element of hatred or ill will. But in that connection the following language was used: "A case may occur of such startling atrocity as not only to create the formation of an opinion in regard to the guilt or innocence of the party accused of crime, but also to engender a personal prejudice of animosity against such person, that is, the case itself may be so horrible as to engender a personal prejudice against the person accused of perpetrating it." And to the same effect, see Gallaher v. State, 40 Texas Crim. Rep., 296. However, the Randle case has been followed in this State since its enunciation; but even if that be an extreme view in the definition of prejudice, certainly the modified doctrine as above expressed can not be successfully controverted. And if it be conceded that an appellant may be charged with the commission of an offense so atrocious as to create a prejudice against him, then evidently this case meets the full measure of the most exacting requirement; for in wickedness and atrocity it is equaled by few and excelled by none in the annals of criminal jurisprudence. The statements of the witnesses introduced, their intelligence,

apparent disinterestedness, and their means of information, although a majority of them lived in the city of Dallas, it occurs to us was enough, and more than enough, to convince the most skeptical mind that the case against appellant and his confederates was well known and thoroughly discussed throughout the limits of Dallas County, and that the evidence against appellant had permeated every portion of that community. True, a majority of the witnesses say that they could give appellant a fair and impartial trial, and they believed he could get such trial in Dallas County, but they admit they have formed an opinion to the effect that appellant is guilty of burning a man, and that he ought to be hanged or burned therefor. If fair trial by jury, as guaranteed by the Constitution, be of any worth, what bides it, or of what avail is it, if a citizen charged with burning a fellow man is to be tried by a jury composed of men who have heard all about the offense, and who believe he is guilty and ought to be hanged, and yet believe—no doubt honestly—that they can give defendant a fair and impartial trial? Prejudice is a sinister quality. It may possess a man and he not be aware of it; or, being aware of it, he may purposely conceal it, in order that he may vent his revenge. In according a change of venue our statutes wisely provide against that prejudice which may creep into the jury box. It is intended to avoid, as far as possible, the impanelment of even one prejudiced juror; and our decisions proceed upon the idea that, where a crime, on account of its atrocity, has become notorious, and the prevailing sentiment in the community is that the party charged with the offense is guilty, he is entitled to a change of venue. Here the testimony was all one way. The State introduced none, and the learned judge deprived appellant of the privilege of introducing further testimony. If the testimony adduced was not satisfactory, certainly he should have afforded appellant the right to introduce other evidence. But, unquestionably, in the face of the testimony already received, it did not lie with him to refuse to hear other evidence of the same character, and then refuse to grant the change of venue. Such a course, in the face of our decisions, was only calculated to shift the responsibility, and delay the final determination of this case.

Appellant also made a motion to quash the venire. We will not discuss this matter further than to remark that the attempt to get a venire in this case affords an additional reason why the venue should have been changed. Most of the venire selected were disqualified on account of having been summoned in cases against appellant's codefendants and other causes, so that appellant had to select a jury from thirty-four special veniremen, instead of one hundred and fifty as originally drawn and summoned in his case.

Over the objections of appellant, the State was permitted to present an object lesson to the jury, intending to illustrate how deceased was burned. They first turpentined a piece of woolen goods, then set it on fire, and in the presence of the jury attempted to put it out. This was objected to on the ground that it was irrelevant, and was not in the nature of sworn

testimony, and could subserve no purpose except to prejudice and inflame the minds of the jury. While it has been held that experiments could be made under proper conditions, and the testimony of these adduced before the jury (Clark v. State, 38 Texas Criminal Reports, 30), still this was not an experiment. It was not a transaction testified about by any witness, but merely a spectacular exhibition before the jury, and as such was not admissible. Riggins v. State, 1 Texas Criminal Appeals, 724.

In appellant's bills of exception numbers 5, 6, and 17 he questions the action of the court which was predicated on the introduction by appellant of the written contract between the State and the two witnesses Drew Pruit and Will Pruitt. Appellant claims that said written contract contained the testimony of Will Pruitt, and that he introduced it in that connection, and for the purpose of impeaching said witness as to some of his statements. Will Pruitt testified against appellant, but Drew Pruitt did not testify. On the introduction of this testimony it appears the court instructed the jury with reference to both Drew and Will Pruitt as accomplices, and that, if the jury believed they were accomplices, they could not find a verdict on their testimony alone; and, as they were accomplices, they could not corroborate each other. It is assumed by the court that appellant had introduced this contract as testimony, both as to the statement of Drew Pruitt and Will Pruitt, and that it was evidence for all purposes. He explains in this wise: "Counsel for defendant read in evidence to the jury the contract signed by Will and Drew Pruitt setting forth facts to which each would testify on their agreement with the State to testify in consideration of being released from prosecution as shown by the record. This was done by defendant's counsel after Will Pruitt had testified in behalf of the State. The witness Drew Pruitt was tendered to defendant's counsel during the trial as a witness at the time defendant opened his defense, if they desired to use him as such; but defendant declined to use him as a witness for any purpose." By an inspection of the contract it will be seen that the parts relating to the agreement between the State and Will Pruitt could not be read without reading also the contract of Drew Pruitt and what he would testify. Evidently appellant did not introduce this as testimony, but merely for impeachment purposes, and could not have introduced it to impeach Drew Pruitt, inasmuch as Drew Pruitt did not testify. It is assumed by the court that appellant had introduced this evidence as original testimony against himself. The State, however, was not entirely satisfied with this view, as it subsequently tendered Drew Pruitt to appellant as a witness. If appellant had already introduced as original testimony the written evidence of Drew Pruitt, there was no necessity to clinch this by the generous offer on the part of the State to permit appellant to use Drew Pruitt. We pretermit any discussion as to the fairness or unfairness of this conduct on the part of the court, but it does occur to us that the bills of exception can not fairly be construed as evidencing the fact that appel-

lant had introduced against himself as original evidence such damaging testimony as that contained in the contract between Drew Pruitt and the State; and the assumption by the court that he had done so was not only improper, but exceedingly hurtful.

The State also proved by Cornwall that, from his experience as a police officer, when a man is robbed in one of the dives in the "South End," and the proprietor is indicted for robbing him, they always prove the man had no money. This testimony was admitted in evidence, and discussed by counsel for the State and defendant, until the closing argument was reached for the State, when the court withdrew it. Of course, the introduction of this testimony, being purely hearsay, was improper; and it is doubtful whether the action of the court in withdrawing it at the time it did could have cured the error,—that is, remove the effect which such testimony would naturally produce in the minds of the jury. Nor do we believe that the testimony of the witnesses as to what deceased said about the nickel with the hole in it, made as it was, and under the circumstances narrated by the witnesses, was admissible as evidence. It was improper testimony tending to fasten on appellant the crime of robbery. The declaration of deceased was not introduced as a dying declaration, but as res gestae. This was several hours after he had been burned, and made in answer to interrogatories calculated to elicit the desired answer. Nor was the testimony of Will Pruitt, introduced by the State, as to the change in color of Bill Renner's mustache from that of a brown color on the night of the homicide to that of black at the trial—suggesting an endeavor on his part to disguise himself—competent evidence for the State on the trial of this appellant. It was testimony that transpired long after any conspiracy that may have existed between said Renner and appellant as to the commission of the offense. Nor was it competent to show the number of children, and their ages, of deceased by his wife, Mrs. Pate Bane. No pertinency whatever is shown as to this matter, and it was simply intended to excite the sympathy and prejudice of the jury. Nor was it competent to bolster up, as was attempted to be done, the testimony of Will Pruitt, by proving by him that the county attorney, at the time he made the contract with him, told him if he implicated or brought into this any innocent man, that the contract would be forfeited. It is true appellant attempted on cross-examination to entangle said witness, and contradict him upon important matters by other witnesses. But this did not authorize the State to corroborate its witness by proving that he was telling the truth because he had contracted to do so and had also contracted not to implicate any innocent man. The testimony of J. D. Brannan that he heard some one saying, as he ran over to the saloon, "There is a man burning up in there, and they set him afire, too," but that he did not know who that young fellow was, was also incompetent. It was hearsay, made by some unknown person, and not by any of the participants, and was not res gestae. Nor, in our opinion, was it competent to prove by the witness John Willie, long after the commission of the

alleged offense, that Chapman told him he got the nickel with the hole in it from one Rablowitz, a second-hand dealer, who lived next to his saloon. Said declaration was made long after any alleged conspiracy between the parties Chapman and Renner had transpired, made in the absence of appellant, and could in nowise bind him.

We would further observe that the charge of the court on principals is not in accordance with the rules of law, as we understand them. We quote said charge, as follows: "Or if you believe from the evidence beyond a reasonable doubt that in Dallas County, Texas, on or before December 3, 1900, that any person or persons bought turpentine or other inflammable fluids, and carried it into the saloon of Chapman & Faulkner, and that said turpentine or other such fluid was poured upon the body of said C. P. Bane by any person or persons, and that the defendant was present in said saloon acting as a principal, as principals have been defined, and knew said turpentine or other inflammable fluid was poured or being poured or placed upon said Bane by any person or persons, and said match ignited and fired said turpentine or other inflammable fluid by any person or persons might probably result in the death of said Bane, and that said defendant, then and there acting as a principal as aforesaid, reasonably knew that such act might so probably result, and that the defendant was then and there the owner or one of the owners of said saloon, and that said burning of said Bane occurred in said saloon, and caused the death of said Bane, and that said defendant set said Bane on fire, or acted as a principal therein,—then, in that event, the defendant would be guilty, as a principal, of murder in the first degree, by torture, whether he participated in the said act or not, and whether it was intended to kill the said Bane or not, or whether the said Bane had been robbed or not; and without reference to what the unlawful intent of setting the said Bane on fire may have been, then you should so find and frame your verdict as directed above." The above charge is somewhat confused in that portion where the jury are told that, if appellant poured said turpentine on deceased, or knew that some one was pouring it on him, and some one ignited the match and fired said turpentine, and that appellant was present, and acted as a principal as that term had previously been defined, that he would be guilty, etc. This of itself might be regarded as announcing a correct legal principle rather abstractly, yet the court interpolated in that connection appellant's ownership of the saloon, which, under the circumstances, the jury were likely to regard as evidence or presumptive evidence of guilty knowledge on the part of appellant that some one set Bane on fire; at least, the charge is obnoxious to this criticism, and certainly it is not such a clear exposition of the law as appellant was entitled to have. If the law of principals had been directly applied in that connection to the facts, it would have afforded a better guaranty that the jury would measure fairly the evidence tending to show his guilt; that is, if they had been told, if appellant ignited the clothes of deceased, or was present at the time they were ignited by some other person, and he knew they were being so ignited, and he aided

such person or persons by words or gestures, that he would be guilty as a principal. But the vice which pervades the whole charge, and which qualified it, is in the latter clause, where the jury are told that "defendant would be guilty as principal of murder in the first degree by torture whether he participated in the said act or not, and whether it was intended to kill the said Bane or not, or whether the said Bane had been robbed or not, and without reference to what the unlawful intent of setting the said Bane on fire may have been." The jury had previously been told that appellant must have participated in said act as a principal, but in the concluding part of the charge they are told to convict him whether he participated in the act or not. They are first to convict him as a principal, if he participated in the act, and they are then told to convict him whether he participated or not. Evidently the latter portion of this charge was contradictory and misleading, and its effect was to qualify the preceding portion thereof. It is not necessary here to lay down a form of charge that should be given further than to state there were two theories as to the guilt of appellant. One flowed from the State's testimony to the effect that appellant was present and aided in pouring the turpentine on deceased, and that he set fire to him. The other, which was based on the testimony of appellant's witnesses, was to the effect that he was not present when deceased was set on fire, but at that time he was in the front of the saloon, behind the counter. On the first theory the court attempted to instruct the jury as we have above indicated, but on the last theory no instruction was given. Those asked by appellant on the subject were refused. Now, if appellant conspired with others to pour turpentine on deceased, and then set fire to and burn him, he would be guilty, though he was in the front part of the saloon at the time; or if he did not conspire with others to set fire to deceased, if he was present in the saloon, and knew that others were engaged in setting fire to deceased, and he aided them by acts, words, or gestures in any wise, he would be equally guilty with those who set fire to deceased. But, on the contrary, if he only engaged with others to turpentine deceased, and without his knowledge and consent some one else set fire to and burned deceased to death, then he would not be guilty. Guffee v. State, 8 Texas Crim. App., 187; Blain v. State, 30 Texas Crim. App., 707; Mitchell v. State, 36 Texas Crim. Rep., 309; Red v. State, 39 Texas Crim. Rep., 667; Leslie v. State, 42 Texas Crim. Rep., 65; Bibby v. State (Texas Crim. App., Tyler Term, 1901), 65 S. W. Rep., 193. These principles of law, in clear and distinct phraseology, should have been presented to the jury.

We do not deem it necessary to discuss the testimony in this case, nor to pass judgment upon its weight, further than to say that, as manifested by this record, the State presented a strong case against appellant. But on that account it became the more necessary that all the safeguards which the law provides to secure a fair and impartial trial should have been carefully preserved. These rules were intended for the protection not of the guilty, but of the innocent. Yet if, on the trial of even a

guilty man they should be violated, who can tell how soon precedents so coined will go to entrap and destroy the innocent? At any rate, it is our duty to see that the rules of law, which are intended to secure a fair and impartial trial and to guaranty that the channels of justice shall remain pure and unobstructed, are duly observed in every criminal trial. That appellant has not been accorded this is manifest from the errors heretofore pointed out. The judgment is accordingly reversed, and the cause remanded.

*Reversed and remanded.*

Davidson, Presiding Judge, absent.

[Note.—The State's motion for rehearing was overruled without a written opinion.—Reporter.]