### NORVIN HOLLAND v. THE STATE.

#### No. 4358. Decided February 28, 1917.

**1.—Murder—Manslaughter—Charge of Court—Converse Proposition.**

Where, upon trial of murder and a conviction of manslaughter, the State showed by circumstantial evidence that defendant and others acted together as principals in the commission of the offense, and the theory of the defense was that no such agreement or conspiracy existed, and the court only submitted the theory of the State in his charge on manslaughter, but did not submit the converse of the proposition to acquit the defendant in that event, the same was reversible error. Following Mitchell v. State, 36 Texas Crim.· Rep., 278, and other cases.

**2.—Same—Evidence—Insanity—Expert Witness.**

Where, upon trial of murder and a conviction of manslaughter, one of the issues was the insanity of the defendant, and the defense introduced a physician who qualified himself as an expert to testify as sought by the defendant on the question of insanity, although he did not claim to be such an expert, it was reversible error not to permit such witness to testify as an expert as to his opinion either as to the facts he knew or his observation or upon a hypothetical question, and it was not required that such witness be an alienist or a specialist.

**3.—Same—Independent Impulse—Principals.**

Where, upon trial for murder and a conviction of manslaughter the State's theory was that the defendant and his two brothers engaged in a conspiracy or understanding to whip the deceased at any hazard, and the defendant contended that there was no such conspiracy nor understanding but that it was a fight of his own, when one of his brothers came upon the scene of his own initiative and killed the deceased, the court should in addition to the State's theory, have submitted the defendant's theory. Following Guffey v. State, 8 Texas Crim. App., 187, and other cases.

Appeal from the District Court of Callahan. Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of manslaughter; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*Cunningham & Oliver, W. R. Ely,* and *B. F. Russell,* for appellant.— On question of court's failure to charge on defense's theory as to principals: Goodwin v. State, 120 S. W. Rep., 585, and cases cited in opinion.

On question of expert witness on insanity: Pigg v. State, 43 Texas, 108; Toomes v. State, 54 Cal., 509; Green v. State, 64 Ark., 523; Davis v. State, 35 Ind., 496; Abbott v. Com., 107 Ky., 624.

*E. B. Hendricks,* Assistant Attorney General, for the State.

DAVIDSON, Presiding Judge.—Appellant was convicted of manslaughter, the jury assessing his punishment at three years confinement in the penitentiary.

Several months prior to the homicide appellant lived with and worked for deceased. About two weeks prior to the killing they had a "falling out," growing out of the fact that appellant refused to sharpen a hoe used by the daughter of deceased. During this trouble appellant and deceased's wife had some words and an altercation in regard to washing done by the wife of deceased for appellant; they became angry, and she ran appellant off the premises, chasing him with a chair with which she undertook to strike him. Appellant ran away from the place and did not return. Appellant went thence to the house of a brother-in-law of deceased and remained there in the employment of this brother-in-law. Appellant's brothers, Dorman and Hill Holland, were living with their father at the time some miles distant from where the above trouble occurred. There is no evidence showing that appellant went to the residence of his father after the trouble with deceased and prior to the killing. Dorman Holland killed deceased at the time appellant and deceased were engaged in a fight at a store on primary election day, 1916. This trouble seems to have grown out of the fact that appellant claimed that deceased called him, in the trouble at the home of deceased, a son-of-a-bitch, for which appellant demanded an apology. Deceased denied using the epithet, and a wordy altercation occurred between them,

and upon deceased flatly denying using the term, appellant called him a liar, whereupon deceased struck or struck at him with a jug weighing about ten pounds and either knocked appellant down or he fell when struck at by the deceased. This is a matter of dispute and doubt as viewed in the light of the testimony. While they were engaged in this difficulty and about the time appellant was getting up from where he had ·fallen or was knocked down, his brother Hill· Holland came to his rescue and entered into the combat evidently to assist appellant. While these parties were engaged in fighting, Dorman Hollend came to· the edge of the gallery from out-doors somewhere and fired a shot which resulted in the death of deceased. The testimony renders it uncertain whether Dorman Holland was present at the inception of the trouble. He was outside the house somewhere; possibly inside of the house. He came up from the outside, however, and fired a shot from near the edge of the gallery. The State's theory was that prior to this trouble and before deceased came to the store, appellant and his brothers had a conversation. What that conversation was is not disclosed. The fact that they had the conversation was shown. It occurred before the killing and before deceased came to the store. The State's theory is that appellant was a principal to the killing, and being so, was guilty of the homicide, although Dorman Holland did the shooting. This theory is based upon the idea that deceased was to take a whipping from appellant, and if he did not submit to this, then further action might be taken. In other words, the theory of the State was that deceased was either to take a whipping, or the consequences if he did not. If such an understanding was had and appellant was a party to it, the law of principals was properly given; but if no such understanding was had, or in contemplation, then the law of principals would not be applicable. If appellant undertook to whip deceased for the insulting remark in calling him a son-of-a-bitch, and the brothers were not aiding him or encouraging him and had not agreed to it, the law of principals would not apply; or if that was an issue, then the law applicable to that theory perhaps was justified in the charge. The law of principals would be applicable under such circumstances. The State's case was not based upon positive or direct evidence, and could only be reached by deduction from circumstances. It is not necessary to detail these circumstances. The theory of appellant was the converse of this.

The court gave a charge authorizing a conviction for manslaughter from the standpoint of the three brothers acting together, and that Dorman Holland having killed under those circumstances would make appellant guilty of the homicide. The court submitted this phase of the law favorable to the State. He did not, however, give the converse of the proposition which, in our judgment, he should have done. If this conspiracy or agreement of acting together was not believed by the jury, or there was a reasonable doubt of it, they should have been instructed to acquit of the homicide. This the court not only did not do, but refused the special requested instructions presenting this phase

of the law. There were two of these special charges, which we deem unnecessary to quote. They properly presented the proposition, that under the circumstances if the jury did not believe they were acting together under a conspiracy or an agreement, and that Dorman Holland killed deceased of his own initiative when he came upon the scene and saw the trouble between his brother and deceased, in which a jug was being used by deceased, then appellant would not be a particeps criminis to the killing. If Dorman Holland came upon the scene and found the trouble between them and was not a party to a previous agreement, appellant would not be guilty of the killing by his brother. We deem it hardly necessary to quote the charges. These issues were raised by the evidence, and were not given by the court, and special charges presenting them were refused. This was error. All issues suggested by the evidence should be submitted in the court's charge. The jury could have taken appellant's view of the case. Whether they would or would not is but speculative; nor is there any way of ascertaining what the verdict would have been, unless they had been properly charged in regard to these questions. The verdict was rendered for the State under the charge given, but the jury had no opportunity to pass upon the other side of the question and find for appellant on his theory. For cases collated see Branch's Crim. Law, sec. 242; Mitchell v. State, 36 Texas Crim. Rep., 278; Harris v. State, 15 Texas Crim. App., 629; Blaine v. State, 30 Texas Crim. App., 702; Goodwin v. State, 120 S. W. Rep., 585; Cecil v. State, 44 Texas Crim. Rep., 450; Faulkner v. State, 43 Texas Crim. Rep., 311; Chapman v. State, 43 Texas Crim. Rep., 328; Renner v. State, 43 Texas Crim. Rep., 347.

A bill of exceptions recites that while Dr. Powell was testifying he stated that he was a practicing physician; that he was a graduate of a medical college of Louisville, Kentucky; that he had attended postgraduate schools since then; had been practicing medicine twenty-five years; that he was county health officer and had been for a number of years; and he further stated he was acquainted with the defendant, and treated him as one of his physicians when he had typhoid fever about six years ago that he saw him twice while he was down with fever. He says the effects of the disease of typhoid fever on the mind depend somewhat upon the character of the disease; some is much more severe than others; some have a very mild type and does not seem to affect the mental capacity very much, but that Norvin Holland had a very severe attack. He further stated: "In my studies at different universities I studied insanity. I have read about it in my journals and I have read the text-books. I took that in connection with other diseases in my course of study, but I have not given it special study. I have studied the disease of insanity in connection with other diseases while I was going to school and since I quit school. In my practice I have had occasion to refer to the books and to read on the diseases of the mind as well as of the body, including insanity. I have heard the testimony of his father, and his cousin, and his sister, who have testified here

tonight, and have heard all of the evidence offered by the defendant on the question of his insanity." At this juncture defendant offered to prove, and but for the action of the court hereinafter set out, would have proved by said witness, that assuming the evidence of said witness to be true, and that the jury believed the same, in his opinion the defendant was of unsound mind on the occasion testified to by said witnesses, and on the 22nd day of July, 1916, and that in his opinion as an expert the defendant on said day did not know that his action in connection with the homicide was wrong. The court of his own motion, before. permitting the witness to testify, asked him questions and elicited the following reply: "I do not hold myself out as an expert on insanity or mental conditions of the mind. I have testified in a number of insanity cases, but I do not claim to be an insanity expert, anything more than a practice that a general practitioner would have during twenty-five years of practice. That is the extent of the experience I have had." The court then held that said witness was not competent to testify as an expert because he had not shown himself to be an alienist or specialist on insanity, but stated that he would be permitted to testify as a non-expert, but defendant, through his counsel, stated that he offered this witness as an expert, and offered the above as evidence of an expert, but it was excluded from the jury, to all of which defendant objected. We are of opinion the court was in error. If under the statements of this witness he was sufficiently qualified as an expert to testify as sought by defendant, he was authorized to testify as an expert. This witness may not have thought it proper to say that he was an expert, and possibly did not believe he was, but that is not the controlling question. If he places himself in such attitude to the testimony and a knowledge of the matters of inquiry, and familiarity with them, he would be sufficiently an expert on insanity to testify as to his opinion either as to the facts he knew, or observations, or upon a hypothetical question. The court was in error in supposing he must be an alienist or a specialist. That is not required in order to get the testimony of a medical witness under the circumstances here detailed. The court was in error, and sufficiently so to require a reversal.

It seems appellant had not been afflicted with insanity up to and prior to the time he had typhoid fever. After that the testimony strongly indicates that he had a peculiar mental condition, illusions, delusions and hallucinations, all of which were out of the ordinary and abnormal. For instance, on one occasion he mentioned to a witness that at night he had seen angels coming into his room down through the walls and the ceiling and that he talked with them, and that the angel Gabriel was there and resurrected him from the grave; that he had died and that he was resurrected through the influence and work of the angel Gabriel; he also stated that Elijah came and talked to him, and some of the other noted Bible characters, and he could not be convinced that this was not true. On another occasion he talked with his

father, who seemed to be somewhat depressed financially, and appellant offered him all sorts of sums of money; told his father that he need not to be troubled about it; that he had money in the bank at Clyde; that he had such an amount there that the bank officers, cashiers and tellers and other officers were totally unable to count it on account of its prodigious amount; that they had added and added the sums up until they exhausted themselves, and then got an adding machine and had been totally unable to add up the vast sums of money he had in the bank through the agency of that machine. In truth and in fact it seems he had no money in the bank. On another occasion he said that he was sick in a hospital or sick in bed somewhere and had a trained nurse with him, and that at one time the parties all left the room except himself and the nurse and that she disrobed herself to a state of nudity in his presence and took a bath and tried to seduce him in having intercourse with her, but he declined, and that she made all sorts of exhibitions of herself to him, and finally when he declined she got on top of him on the bed and ravished him, causing his private parts to bleed, and offered to show his gown with evidences, as he said, of blood on it; and that she had since married a man and gone to California, and that he was so outraged at the woman that he felt like going to California to kill her, although she had married another man and gone away. Sometimes his mind would be clear and he would make good trades, and other times he seemed to have made foolish trades.

Now in regard to the matter about which the killing occurred, appellant insisted deceased had called him a son-of-a-bitch and it played upon his mind. He believed it and talked about it; said deceased had to apologize; that he would not stand being called a son-of-a-bitch. Those who seemed to have been familiar with what occurred between them at the time of the trouble at the residence of deceased when deceased's wife chased him away with a chair, stated that deceased did not call him a son-of-a-bitch, but called him a liar, and perhaps used some other expression, but appellant insisted that he called him a son-of-a-bitch and he intended to have him apologize for it, and when he accosted him at the time of the trouble deceased denied calling him a son-of-a-bitch, and appellant gave the lie to the deceased, who perhaps knocked him down with a ten-pound gallon jug. This may have been one of his hallucinations or delusions, but if he believed it and it worked upon his mind in view of the other circumstances detailed, this required the court to submit the issue of insanity so the jury would not misunderstand the situation. It is said with reference to insanity, a man may be rational upon some subjects and totally irrational and insane on others. Along this line the court should have been explicit in his charges, and the doctor above mentioned should have been permitted to testify to all these matters that bore upon the question of insanity.

In a general way, with reference to the trouble at the time of the homicide, the State's theory was that if the three brothers engaged in

a conspiracy or had an understanding to whip the deceased at any hazard, the State would have a right to have a charge on the killing as given by the court, but if that was not true, or if the jury should not believe it or there was a reasonable doubt of that, then defendant had the right, independent of the issue of insanity, to have his side of the case charged, that if there was no conspiracy, or if there was not an understanding to whip deceased, and as a result push the matter beyond a whipping in order that deceased take a chastisement or kill him without an agreement between these parties, it would not be a case of homicide as to defendant.   This phase of the law was very fully met and discussed with reference to these various questions by Judge Clark in one of his ablest and strongest opinions, in the judgment of the writer, found in the reports, Guffey v. State, 8 Texas Crim. App., 187.   If appellant engaged in a difficulty with deceased because he believed he had called him a son-of-a-bitch, and he believed it whether deceased did it or not, and asked a retraction, and it was not granted, and they engaged in a personal difficulty without any previous agreement with his brothers to aid him in the matter, and it was a fight of his own, and his brother came upon the scene and of his own initiative did the killing, appellant would not be responsible for the homicide; and if his brother Hill Holland, seeing the situation, came to his rescue and engaged in the difficulty, and the other brother, Dorman Holland, came upon the scene, without knowing what had happened, and without any agreement between them, and fired the shot under the circumstances, still appellant would not be guilty of the homicide.   We are discussing Dorman Holland's relation to the case on the theory that appellant was convicted for the shooting of the deceased under the circumstances.   Of course, if the shot occurred and the fight was carried on with a prior agreement between the parties, they all would be responsible; but if not, then appellant would not be guilty of the homicide, and the jury should have been so instructed.   The other alleged errors are not discussed because as presented do not show reversible error.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*