RUDOLPH ECKERT v. THE STATE.

. No. 7588.   Decided May 23, 1923.

1.—Murder—Manslaughter—Charge of Court—Rule Stated.

Insulting words which are merely an insult to the accused, such as calling another a "sun-of-a-bitch," are not sufficient to constitute adequate cause for manslaughter passion, and there was therefore no error in not submitting manslaughter in the instant case; besides, it did not appear that the killing took place immediately upon the uttering of the insulting words, or upon the first meeting of the parties thereafter.

2.—Same—Insanity—Evidence—Hypothetical Question.

Where, upon trial of murder, the defendant claimed insanity at the time of the homicide, and among other things offered to show by two reputable expert physicians submitting to them the testimony upon the trial by a hypothetical question, whether the acts and conduct at the time showed that the defendant was insane, which the court refused, the same was a reversible error.

Appeal from the District Court of Gillespie.   Tried below before the Honorable J. H. McLean.

Appeal from a conviction of murder; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*A. P. C. Petsch, A. W. Moursund, Taliaferro, Cunningham & Moursund,* for appellant.—On question of Insanity, State v. Holland, 192 S. W. Rep. 1070; Davis v. State, 35 Indiana, 496; Territory v. Davis, 10 Pacific, 363.

*R. G. Storey,* Assistant Attorney General for the State.   On question of insanity, Burt v. State, 39 L. R. A., 317; McLeod v. State, 31 Tex. Crim. Rep., 331.

LATTIMORE, Judge.—Appellant was convicted in the District Court of Gillespie County of murder, and his punishment fixed at seven years in the penitentiary.

Appellant and deceased were brothers, and there is no dispute over the fact that for many years there had been bad feeling between them. They were close neighbors. On the morning of the 10th of March, 1921, as alleged in the indictment, appellant took his shotgun loaded with small shot and walked out into his brother's field where the latter was plowing and without much preliminary conversation demanded that the deceased take back some things which the latter had said on March 7th. We quote from appellant's own testimony at this point:

"As to what took place between Ernest Eckert and myself on the 10th of March, at the time he was shot, will say as far as I can remember I asked him to take back what he said on the 7th, and as much as I can remember, he said 'I won't take it back, because you are a son-of-a-bitch anyhow.' And then as much as I can remember, -I told him I would count One, Two, Three, and if he didn't take it back he would find out something, so I said, 'Once,' and he didn't give any answer; I said, 'Twice,' still he didn't give an answer, and then I gave him another chance, and I said 'Three,' and still he didn't answer, and I pulled the gun."

The things referred to as having occurred in the conversation on March 7th and for which retraction was demanded by appellant, are stated by him in his testimony to be as follows:

"The conversation that took place there at that time was, I told him he had always cursed me and cursed my children, and I told him he had to cut out this talking about me, or else I would tell who caught him in a cellar, and he said, 'Who was that that caught me in a cellar,' and I said it was Mr. Dietz, and he said 'Dietz is a damn liar, and besides, you are a son-of-a-bitch.' I asked if he knew what a 'son of a bitch' meant, and he says, 'Yes; I don't know who my father is and Mrs. Klinglehoefer don't know who her father was.' Of course that struck me, and I don't know what I done after that. That was on the 7th of March, 1921. Mrs. Klinglehoefer is one of my younger sisters, and Ernst Eckert was my youngest brother."

Appellant excepted to the charge of the trial court for its failure to submit the law of manslaughter and also presented a special charge upon this issue which was refused. This is here urged as error. If we correctly understand the law of manslaughter there was no error in the action of the trial court in refusing to submit the law of such issue. There are numerous decisions in this State, many of which will be found cited by Mr. Branch in his Annotated P. C., Sec. 2010, which lay down in general terms the proposition that insulting words which are merely an insult to the accused, are not sufficient to constitute adequate cause for manslaughter passion, and many of those cited

are specific in saying that to call another a son-of-a-bitch will not be a sufficient predicate for such passion, said words being deemed an insult to the accused himself and not to a female relative. This seems to be the language used by deceased on both the 10th of March, the date of the killing, and the 7th of March in the converastion which ap-·pellant demanded that deceased take back. Not only for the reason just mentioned does there seem no manslaughter issue in this case, but we observe that it is specifically stated in Article 1133 of our Penal Code that where it is sought to reduce a homicide to man-slaughter by reason of insulting words or conduct to a female relative, it must appear that the killing took place immediately upon the uttering of the insulting words or so soon thereafter as the party killing meets the party killed. There is no question of the fact that the words for which retraction was demanded, and upon which ap-pellant relies to establish the fact of insulting words to a female rela-tive, were uttered by deceased to appellant himself on March 7th and do not appear to have provoked the latter to then make any attack evidencing sudden passion or rage. It would appear to be contrary to the express terms of our statute as well as to reason itself to permit one to have language which might be deemed within the comprehension of the statute,—insulting words,—uttered to him and exhibit no resent-ment, and after thinking the matter over for two or three days or any length of time, then conclude that he may go and slay the traducer and attribute the killing to sudden passion and have it reduced to manslaughter.

There is a more serious contention before us in this record. .Appel-lant claimed that by reason of the language and conduct of deceased, or from some other cause, after deceased uttered the insulting words to him on March 7th that he became insane and was so insane at the time he fired the fatal shot which took the life of his brother. This seems to have been the principal defensive issue. He introduced his wife who testified to much disturbance mental and physical on his part after March 7th and prior to the shooting. Appellant testified himself that he was conscious of very little that took place after the insulting words and conduct on March 7th up to and until after the shooting. We make no extended discussion of the weight and im-portance to be attached to such insanity, keeping in mind the fact that these are questions for the juries to decide under appropriate in-structions. Upon his trial appellant introduced several doctors who had been practitioners of medicine for many years and who had had occasion to treat mental diseases, and who were familiar from reading and study with the rules and principles governing diseases of the mind. Appellant asked each of these physicians a hypothetical ques-tion or questions in which he attempted to state to them the facts as testified to by the defense witnesses showing the acts and conduct and condition of appellant during the time mentioned, as reflected by

the testimony for the accused, and sought to elicit from each of said witnesses his opinion based on the assumption that the facts stated in the hypothetical question were true, as to whether or not appellant was insane at the time he fired the fatal shot. Upon objections by the State the trial court declined to permit said witnesses to answer such question. In this we think the learned trial judge in error. We have no desire to attempt to lay down rules for determining when a physician is an expert alienist and when not. We do not think it possible to lay down hard and fast rules in such cases. Manifestly it would be difficult and probably impossible to procure doctors who spend all of their time in studying mental diseases, in every case where the issue might be raised by testimony. The weight of such testimony is always for the jury, and it occurs to us that the State may protect itself by cross-examination against immature or unsupported opinions given upon such hypothetical cases. In our opinion one who has been a practitioner of medicine, is a graduate of recognized schools and had had occasion in the course of his practice to observe and treat cases of mental disorder, should be permitted to give his opinion based on a hypothetical statement of the facts in testimony in a given case, as to the mental soundness of the accused at the time of the commission of the crime. Of course if this may be done by one side, it may be done by the other, and if the facts stated in such question do not support the conclusion announced by such witness, in our opinion the juries of the country may be trusted to understand that the final solution of the matter is for them. The only authority in this State which seems at all directly in point is the case of Holland v. State, 80 Texas Crim. Rep., 637, which supports our conclusion. We do not intend by what we have said to broaden the rules governing the admission of non-expert opinions as to insanity, but do believe it a safe rule to permit physicians such as above mentioned to answer questions fairly embracing the testimony relied upon as showing insanity.

For the error of the rejection of this testimony we think the judgment must be reversed and the cause remanded, and it is so ordered.

*Reversed and remanded.*