### H. N. SWAIN v. THE STATE.

No. 3259. Decided March 22, 1905.

#### 1.—Murder—Charge of Court—Manslaughter—Adequate Cause.

Where in a prosecution for murder the evidence showed a series of acts of provocation on the part of deceased, which although not similar and any one of which alone might not have been sufficient as a provocation, but which in connection with the act immediately preceding the homicide, looked to through all the antecedent acts and circumstances, would have a tendency to inflame the mind of defendant to such a degree as to render it incapable of cool reflection, it became a question of fact, as viewed from defendant's standpoint whether there was adequate cause, and required a charge on manslaughter.

**2.—Same—Charge of Court—Self-Defense—Threats.**

Under article 713, Penal Code, the defendant in a prosecution for murder was entitled to a charge on threats, independent of a charge on self-defense, where the evidence presented this phase of the case, and it was error to limit the execution of such threat to an actual attempt to execute the same. Any act of the deceased which the defendant may have believed evidenced an intention to carry his threat into execution would be a basis for his action on the theory of self-defense, as viewed from defendant's standpoint alone, and not what the jury or the court may have thought about it, or whether the danger was real or not.

**3.—Same—Charge of Court—Definition of Terms—Implied Malice.**

In a charge on murder in the second degree, the court should inform the jury in regard to what is meant by the terms "mitigate, excuse or justify the act," so as to give them some criterion by which to form a conclusion as to whether the killing was upon implied malice.

**4.—Same—Evidence—General Reputation For Truth—Rebuttal.**

Where in a prosecution for murder, the defendant's testimony on the trial was sought by the State to be contradicted by his testimony on a habeas corpus trial, he should have been permitted to offer testimony as to his general reputation for truth and veracity.

**5.—Same—Evidence—Acts of Third Parties—Influencing Witness.**

Where it was not shown that defendant had any connection with the acts of third parties that may have influenced a State's witness, it was error to admit testimony of this character.

Appeal from the Criminal District Court of Harris.    Tried below before Hon. J. K. P. Gillaspie.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the ase.

*Fisher, Highsmith, Fisher & McGregor, E. T. Branch* and *Brochman & Kahn,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—Upon conviction of murder in the second degree, appellant's punishment was fixed at confinement in the penitentiary for a term of ten years.

Exception was reserved to the failure of the court to charge upon manslaughter. In this we think there was error. Howard v. State, 23 Texas Crim. App., 265; Bonner v. State, 29 Texas Crim. App., 223; Neyland v. State, 13 Texas Crim. App., 536; Rutherford v. State, 13 Texas Crim. App., 92; Hobbs v. State, 16 Texas Crim. App., 517; McLaughlin v. State, 10 Texas Crim. App., 340. In Neyland's case, it was said: "If, on account of the acts of the deceased, taken in connection with his previous threats, defendant was put in such a state of anger, rage, resentment or terror, as in a person of ordinary temper was sufficient to render his mind incapable of cool reflection, then there was 'adequate cause' for the killing (passion), and it would be of no higher degree than manslaughter. Such facts might have been insufficient to

satisfy the jury that defendant acted in self-defense, and yet be amply sufficient to warrant them in finding manslaughter." In that case threats had been made by deceased against the life of defendant, which had been communicated. Shortly before the killing deceased had his pistol out, and defendant was remonstrating with and trying to induce him to put it up. After he was shot the pistol was found on the ground by his body.

In Howard's case it was said: "It is not essential that an overt act or demonstration (of deceased) be sufficient to justify or raise the issue of self-defense, but if, in connection with other antecedent facts and circumstances, it is sufficient to excite in the mind of a person of ordinary temper sudden passion, rendering it incapable of cool reflection, then 'adequate cause' would be produced sufficient to raise the issue of manslaughter, and the law of manslaughter would be the law of the case."

In that case this quotation was made in regard to the facts: "Russell had threatened the defendant; Russell peeped into defendant's window and walked off; defendant came out of his office with a shotgun; someone said don't do that; Russell turned his head; put his hand to his side, whereupon defendant shot." To the same effect is Hobbs v. State, and Bonner v. State, supra.

It is a well established rule that while one act might not be sufficient as a provocation, but taken in connection with others is a series of acts, whether similar or not, which may have immediately served as the provoking cause, will be sufficient to require the court to submit the issue of manslaughter. In other words, where the act performed by deceased immediately preceding the homicide will not of itself be sufficient, that act should be looked to, through all the antecedent acts and circumstances, which would have the tendency to inflame the mind to such a degree as to render it incapable of cool reflection. Viewed in the light of these authorities and our statute, the issue of manslaughter should have been given in charge. Some of the facts may be here related.

The father of appellant had organized a fire insurance company and had considerable trouble and worry in doing so. He was elected its president. Deceased was secretary and was endeavoring to oust him from the presidency and control of the insurance company. Defendant, on the Saturday previous to the killing on Sunday, remonstrated with deceased about his treatment of his father. This conversation occurred on the street in the city of Houston. Deceased replied "in a sharp testy manner," that he did not want to talk with defendant; that it was none of his business; defendant had nothing to do with it and did not own a dollar's worth of stock in the company, and if he had not forgotten to put his pistol in his pocket when he left his office, defendant would not talk to him in that way. Defendant replied, you must stop this dirty work. Deceased replied: "I am going to stop you," and walked away. This occurred on Saturday evening, twenty-two to twenty-four hours prior to the killing on Sunday evening. Deceased

had told witness Lane that he intended to get appellant's father out of the insurance company, and in effect that he would kill defendant. This threat was communicated to defendant prior to the killing. This was not denied by deceased but the threat was evidently renewed during the conversation with appellant on Saturday evening; at least that was the effect of the conversation. Deceased had also informed Mrs. Tanner that if defendant ever came into the company's office that he would kill him; that he was prepared to do so at all times, and showed witness his pistol, which he kept constantly in the drawer in the office where he could get it; or in his hip pocket when out of the office. S. T. Jones, testified that he had gone with deceased to a store in the city of Houston, where deceased bought a pistol. That deceased kept his pistol in his office, and about his person; and that on Saturday evening, prior to the killing on Sunday evening, deceased came to his office and stated he had had trouble with defendant; that he then got his pistol, and said he intended to kill him; that witness stayed with deceased all Saturday afternoon, and finally put him on the car and sent him to his home to prevent him seeking defendant for a personal difficulty; that during this time deceased was excited, mad and armed. The witnesses testifying in regard to the matter, agree that deceased was a man who did not make idle threats but was a man who would execute a threat when made. It was further shown by the undisputed evidence that the meeting of deceased and defendant at the time of the homicide was an unexpected one and in a narrow hall, less than six feet wide; defendant being exposed in the light, and with no hope of escape—deceased being in the dark end of the hall, in the shadow or dim light, and between defendant and the stairway, and in immediate proximity to an angle in the hall and approaching it, and was shot just as he was about to reach this angle, which, if reached, would have given him a position of comparative security as against his antagonist (defendant) and would have practically had him at his mercy. Deceased was between defendant and any avenue of escape from the building. Appellant testified in this connection: "As deceased came into the hall, he turned and locked his door, and just as he was in the act of turning to walk to the corner, he turned his head this way (indicating) and saw me. He turned quick and walked in the direction of Levilloux, who, as deceased was in the act of turning, started towards the corner himself; Levilloux was at least four feet from deceased at the time he started. There was at least that much distance between the two. When Jones had made the turn towards the corner he whirled his head around this way (indicating) and started quickly to the corner, keeping his eye constantly on me. I noticed him, shifting something from his right hand to the left hand. He still was looking at me; he put his hand here (indicating) and seemed to be tugging at his pistol, moving constantly towards that corner. I drew my pistol quickly, cocked it, and then as I did that, Jones made two steps, I think, and he turned quickly and would have reached the corner within a second's time. The impression came upon me like

a flash that he was attempting to draw that pistol, and was trying to get it out and reach that corner, and when he made a leap or quick step, I had no doubt about this. In the rear of me was a window, and I was in comparatively the light part of the hall, and I was silhouetted against it: I was outlined against that window. It flashed through my mind that if he got around that corner, it was dark there, I would be at a great disadvantage, and when he attempted to reach the corner I fired. It was evident to my mind that he was trying to kill me, and I shot to keep him from killing me."

Ellis, chief of police, testified that he was at the body shortly after the killing, and found a revolver half drawn from the right hip pocket of deceased, the same pocket from which defendant stated deceased was attempting to draw it.

Under the authorities this evidence required a charge on manslaughter,

The court's charge on threats is criticised, which was in the following language: "If you find from the evidence that the defendant, H. N. Swain, did shoot said C. W. Jones, with a pistol, and thereby killed him, the said Jones, but you should further find from the evidence that, previous to said shooting and killing he, the said C. W. Jones, had made threats to kill him, the said defendant, or seriously injure him, and that at or about the time of the shooting and killing of said C. W. Jones, he, the said C. W. Jones, was then and there making some overt act to carry said threat or threats into execution, that is, if at or about the said time of said shooting and killing, he, the said C. W. Jones, was then and there making an attempt to draw a pistol from his person, with the intent to kill or seriously injure him, the said defendant, or if it then and there reasonably appeared to him, the said defendant, that said C. W. Jones was then and there attempting to kill or seriously injure him, the said defendant, then, and in that event, he, the said defendant, would be guilty of no offense, and you will find him not guilty." Many objections were urged to this charge. The charge is not correct. It is not the law of threats in connection with the right of self-defense. A proper charge was asked by appellant submitting this issue, which was refused. Exception was reserved to this refusal. Article 713 Penal Code, provides, "where a defendant accused of murder seems to justify himself on the grounds of threats against his own life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification or defense, unless it be shown that at the time of the homicide, the person killed by some act then done manifested an intention to execute the threat so made." The law does not define what "overt act" is necessary and the court erred in limiting this to the act "of making an attempt to draw a pistol from his person, with the intent to kill or seriously injure him, the said defendant." Under the law of self-defense appellant could stand upon the fact that there was an effort made to take his life without threats. He was entitled to a charge on self-defense, as a usual rule, where threats are in the case independent of the threats. If threats enter into the

question, however, an appropriate charge must be given presenting that phase of the testimony; and the law does not require an actual attempt to execute the threats before the demonstration to execute the threats can be relied upon. Any act of the deceased, which the accused may have believed evidenced an intention to carry his threats into execution, would be a basis for his action on the theory of self-defense. It is not necessary for him to wait until his antagonist has drawn or attempted to draw a pistol. It occurs to us that this matter was fully discussed in Miles v. State, 18 Texas Crim. App., 156. This charge is subject to the criticism that it not only requires the jury to find that deceased made an attempt to execute his threat, but that he attempted to draw a pistol with intent to kill appellant. It may be well enough to restate, that the law does not define what act of deceased, taken in connection with threats, will be sufficient or requisite under the law of self-defense. There must be something done, which induced the defendant to believe that his antagonist is about to execute the threat. If the charge of the court is correct in this instance, it goes beyond the statute; injects into the law what the Legislature has not; places a greater burden upon defendant than is required by law and cuts off his right of self-defense at this point until an attempt to draw a pistol has been made by his antagonist. It is not necessary that threats be seriously made as a matter of fact. It is sufficient if the threats have been shown, and that defendant had been informed thereof, and believed they were serious. Whether they were serious or not, if defendant believed they were serious, and deceased was making some demonstration, or defendant so believed, to carry them into execution or acted in such manner as to cause him to believe his life was in danger, he was entitled to the benefit of self-defense; and this whether the court believes the testimony or not. The jury, under our jurisprudence, are the exclusive judges of the facts proved, the weight of the testimony, the credibility of the witnesses; and the court should be careful to apply the law correctly to all the issues raised by the facts.

Again, a charge submitting this issue to the jury, should be based upon the proposition that the question will be viewed from the standpoint of the appearances to defendant, and the effect upon his mind: not what the jury may think about it as an original proposition, or in the light of subsequent events. Defendant has the right to have the case viewed from his standpoint, from the appearances suggested to him, in the light of the matters occurring at the time of the homicide, and those prior to that time. The jury themselves might not believe that deceased intended to execute a threat. To their minds, the evidence might not have been sufficient for them to act had they been in defendant's place. But if the facts suggested to defendant's mind that he was in danger and he so believed, then he could not be deprived of his right of self-defense. The charge upon another trial will be given the jury on the lines above suggested.

A proper charge should also be given to the effect, that whether the

danger was real or not, if it appeared to defendant that his life was in danger from the acts and conduct of deceased, then he had a right not only to kill, but to act so long as these appearances of danger existed in his mind.

In the charge on murder in the second degree, the court failed to inform the jury in regard to what was meant by the terms "mitigate, excuse or justify the act." Upon another trial, the court should correctly inform the jury as to what is meant thereby, so as to give them some criterion by which to form a conclusion as to whether the killing was upon implied malice.

Upon the examination of defendant, while upon the witness stand he stated, that he had testified, upon his habeas corpus trial, substantially as he did upon his final trial. For the purpose of impeaching and contradicting him, and to show that he had testified differently on his habeas corpus trial to what he was then testifying his evidence in the habeas corpus trial was read, which showed some discrepancies and contradictions. In this attitude of the case, appellant offered the testimony of several witnesses to prove that his general reputation for truth and veracity was good. This was refused and exception reserved. This was error. We deem it hardly necessary to cite authorities, but see Thomas v. State, 18 Texas Crim. App., 213; Morrison v. State, 37 Texas Crim. Rep., 601; Burrell v. State, 18 Texas, 713.

While S. T. Jones (witness for defendant) was testifying, the following matters occurred. Upon cross-examination, the district attorney, asked this question: "What position do you hold with the Houston Fire & Marine Insurance Company? A. I am the treasurer. Q. You were elected treasurer on the 11th of January, 1905? A. Yes, sir. Q. Who owns the majority of the stock of the Houston Fire & Marine Insurance Company? A. I think Mrs. Swain. Q. What relation is she to the defendant? A. Mother. Q. Do you know that Mrs. Swain owns more of the stock than any one else? A. Well, I don't know of my own personal knowledge, but I think so." This witness was a cousin of deceased, and had employed counsel to aid in the prosecution of defendant. The election of this witness as treasurer of the insurance company occurred after the homicide. The testimony was evidently intended to show the jury or leave the impression upon their minds, that this witness had been tampered with, else that he could not have been elected treasurer of the company, when the majority of the stock was owned by the mother of appellant. It was not shown, nor undertaken to be shown, that appellant had any connection with the election of this witness as treasurer of the company. In order to introduce this character of testimony against an accused, the accused must be in some way connected with the acts which influenced or which were supposed to influence the action of the witness. The acts of third parties intimidating a witness or influencing him to testify favorably to an accused or falsely, cannot be used against an accused, unless he is connected with those acts. It seems to us that this is an elementary propo-

sition.   Luttrell v. State, 40 Texas Crim. Rep., 651; Gann v. State, 57 S. W. Rep., 668; Huff v. State (Mo.), 61 S. W. Rep., 900.

For the errors indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Henderson, Judge, absent.