## A. A. Spangler v. The State.

### No. 1989. Decided January 24, 1900.

**1. Murder—Witness—Opinion Evidence—Bill of Exceptions.**

On a trial for murder, where a witness for the State was asked as to the looks, manner, and appearance of the defendant on the morning of the killing and whether he seemed to be mad, to which the witness answered "I thought he looked pale and haggard; he seemed as if there was some trouble some way or another;" Held the bill of exceptions was defective in not showing that deceased was with defendant at the time the witness was testifying about, and no language or conversation of defendant being shown nor how long it was from the time witness thus saw defendant before and how remote from the place of killing. When this character of testimony is questioned by a bill of exceptions the particular circumstances surrounding the opinion evidence should be stated so as to show its relevancy.

**2. Same.**

It is error to permit a witness who has testified to the pale and haggard appearance of the defendant to state that from the appearance of defendant it looked as if he "was troubled some way or another."

**3. Same.**

It is error to permit a witness to testify that a short time prior to the killing he had talked with deceased, and that from the way "she talked she seemed to be uneasy." Such evidence was inadmissible and can not be considered as expert testimony.

**4. Evidence—Acts, etc., of Deceased.**

It is not error for the court to reject, as inadmissible, evidence offered by defendant as to particular acts of and by deceased in nowise connected with the homicide and which had not been communicated to defendant nor shown to have operated upon his mind at the time of the killing.

**5. Same—Character of Deceased.**

There is no authority in this State which distinctly holds that evidence of the actual character of the deceased is admissible. Such evidence is confined to general reputation. See opinion, however, for exceptions which should control and limit this rule as to evidence of the actual character of deceased.

**6. Same.**

The character of deceased for violence, if known by or communicated to defendant prior to the killing, is admissible to explain the condition of his mind at the time of the killing and show that he acted in self-defense.

**7.  Defendant as Witness—Cross-Examination.**

On a trial for murder which resulted from a difficulty as to defendant's interest in a herd of cattle, ·and where defendant as a witness had testified that he claimed an interest in said cattle, it was admissible on his cross-examination to show how he claimed an interest in them.

**8.  Witness—Refreshing Memory by Evidence Taken Before Grand Jury—Practice.**

While it is objectionable and reprehensible to read over to a witness, in the presence and hearing of the jury, his testimony taken before the grand jury, still this will not constitute· reversible error where it appears that after it was thus read the witness' memory was refreshed and he then testified to the facts as stated in said testimony before the grand jury.

**9.  Manslaughter—Adequate Cause—Charge.**

A charge upon manslaughter is too restrictive which confines the jury to adequate cause or an act of provocation occurring at the very time of the homicide when there was evidence of other provocations given prior to the one given at the time of the homicide.

APPEAL from the District Court of Clay.  Tried below before Hon. A. H. CARRIGAN.

Appeal from a conviction of murder in the second degree; penalty, fifty years imprisonment in the penitentiary.

The record in the case and especially the statement of the facts is very voluminous.  But the material facts immediately connected with the homicide are so fully stated in the opinion that a further statement is unnecessary; and the facts pertaining to the questions discussed need no further statement to illustrate them.

The indictment charged appellant with the murder of Mrs. S. E. Whitesides, on the 20th day of March, 1899, by shooting her with a pistol.

*P. M. Stine, F. J. Barrett, J. A. Templeton, L. C. Barrett, Jake Hodges,* and *J. M. Hurt,* for appellant, filed a most able brief which the Reporter regrets he can not, on account of its length, reproduce in full. Upon the first question discussed in the opinion they cited:  Irvine v. State, 26 S. W. Rep., 48; Meyers v. State, 27 Texas Crim. App., 208; Harrison v. State, 16 Texas Crim. App., 325; McKnight v. State, 6 Texas Crim. App., 158.

Upon the second proposition they cited:  Segnar v. State, 16 Texas Crim. App., 221; Gay v. State, 49 S. W. Rep., 617; Harvey v. State, 34 S. W. Rep., 624; Jones v. State, 41 S. W. Rep., 639, 642; Chumley v. State, 20 Texas Crim. App., 547.  The questions were leading:  1 Greenl. on Ev., secs. 434, 435, 447.  The evidence was prejudicial: Bell v. State, 2 Texas Crim. App., 215; McDowney v. State, 10 Texas Crim. App., 98.

As to exclusion of actions ·and declarations of deceased, they cited: Lilley v. State, 20 Texas Crim. App., 1; Horbach v. State, 43 Texas, 242.

As to admissibility of evidence of character of deceased for violence, which evidence was excluded, they cited:  Whart. Crim. Ev., secs. 69-84; Horbach v. State, 43 Texas, 248-260; Williams v. State, 14 Texas Crim.

App., 109; Lilley v. State, 20 Texas Crim. App., 1; 2 Bish. Crim. Proc., secs. 610, 1117; Murts v. State, 26 Ohio St., 162, 168; Jones v. State, 41 S. W. Rep., 642; Childress v. State, 30 Texas Crim. App., 160.

As to error in the cross-examination of defendant, they cited: Const. of 1876, sec. 10; Jones v. State, 40 S. W. Rep., 807; Jones v. State, 41 S. W. Rep., 638, et seq.; 1 Gill on Ev., sec. 445; Washington v. State, 17 Texas Crim. App., 197.

As to refreshing witness' memory by reading his testimony taken before the grand jury, they cited: Seals v. State, 38 S. W. Rep., 1006; Volan v. State, 8 Texas Crim. App., 590; Bailey v. State, 40 S. W. Rep., 281; Reed v. State, 46 S. W. Rep., 413; Evans & Co. v. Lannius, 18 S. W. Rep., 201; Railway v. Stone, 25 S. W. Rep., 808.

As to error in charge of court upon manslaughter, they cited: Miles v. State, 18 Texas Crim. App., 156; Orman v. State, 24 Texas Crim. App., 503; Williams v. State, 15 Texas Crim. App., 617; Byrd v. State, 47 S. W. Rep., 721; Gilcrease v. State, 33 Texas Crim. Rep., 619.

*Rob't A. John,* Assistant Attorney-General, for the State. (No brief for the State found with the record.—Reporter.)

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of fifty years, and he prosecutes this appeal.

The evidence shows that deceased, Mrs. S. E. Whitesides, lived on a place of defendant, or one he had leased, in the country, some seven or eight miles from the town of Henrietta, the county seat. They appear to have had some business arrangement by which deceased was to live on the place, and pasture certain cattle on defendant's inclosed land or pasture; and, in consideration of the use of said pasture, she was to cook for defendant and his hands. Some misunderstanding arose between them a few days before the homicide, and defendant concluded to cook for himself, and, evidently, to put an end to the contract between himself and deceased. On Saturday, two days before the killing, appellant went to the place, carrying some supplies with him, and arranged for himself and his hands to cook and take their meals separate from deceased. On Saturday and Sunday he and deceased had several quarrels or altercations. Sunday evening, however, they appear to have become reconciled; and on Monday morning appellant assisted deceased in milking, and in doctoring a calf at the lot or barn. After doctoring the calf, deceased went to the house, and in a short time defendant also left the lot and went to the house, and in a few minutes thereafter the shooting occurred. The shots were fired in the kitchen. No one was present except deceased and defendant. Immediately after the shots were fired, deceased ran out of the kitchen onto the porch, and fell on the ground, where she expired in a very short time. Defendant went immediately to the lot, and told one Smith, who was an employe on the place, that he had shot and killed deceased. He then got in his buggy, and he and his son went to Hen-

rietta, where he surrendered to the officers. The theory of the State was that it was an unprovoked killing. Defendant insisted that what he did was in self-defense; that deceased had been quarreling with him and abusing him for the two days previous to the day of the homicide; that at the house, on the morning of the homicide, she there abused and insulted him, and drew a pistol from her bosom and attempted to shoot him, and he thereupon shot and killed her. He further contended that at most it was only manslaughter, inasmuch as deceased had abused and villified him during the two days previous to the homicide, and, among other things, had declared to him that his wife and daughters were whores. This is a summary of the case, as far as necessary to be stated.

L. R. Smith was introduced as a witness for the State, and, over the objections of appellant, he testified to the appearance of Spangler on the morning of the homicide, as he passed where he was at work, going to the lot to milk. The question propounded to him was as follows: "What was Spangler's manner? How did he look and appear as he came along? Did he seem to be mad?" To which question witness answered: "Well, I thought he looked pale and haggard. It seemed as if there was some trouble some way or another." In the court's explanation to the admission of this testimony, he states that this occurred just before the killing. The objection urged by appellant to this testimony was that said statement was a conclusion of the witness, and because he ought to be permitted to describe only what defendant did, and not what he seemed to the witness. It is a rule of evidence that wherever the physical or mental condition or appearance of a person, or his manner, habit, or conduct, is relevant to the matter under investigation, it may be proved. Lawson on Exp. Ev., p. 466; Powers v. State, 23 Texas Crim. App., 42. The decisions are not uniform as to the extent to which a witness may go in expressing an opinion as to the physical or mental condition of a party; some holding that this character of testimony is uncertain, and is liable to be influenced by the attitude of the witness. In People v. Wolcott (Michigan), 17 Northwestern Reporter, 78, the question before the court being in regard to the appearance of defendant when certain footprints were measured, Judge Cooley uses this language: "The State was allowed, against objection, to show that, while the footprints were being measured, appellant seemed to be excited. From this excitement the jury were expected to draw inferences unfavorable to accused. No doubt, a guilty party may be excited under such charge, and so might an innocent party; and the probability that one or the other would be most affected by the accusation would depend so much upon individual mental and physical peculiarities, that the mere fact of excitement affords no basis whatever for any deduction for or against the justice of the charge. But the evidence of excitement is peculiarly objectionable, because it is likely to be given, as it evidently was in this case, by persons prepossessed with a belief in the guilt of the accused, and very certain, from that fact, to draw unfavorable

inferences, and to have what they see magnified by their imagination."
While this opinion shows the danger of such testimony, yet our courts
appear to allow great latitude in the introduction of such testimony.
We would observe, however, that always, when this character of testi-
mony is admitted, the particular circumstances surrounding the opin-
ion evidence should be stated, so as to show its relevancy. In this
case the bill shows that appellant passed the barn where the witness
and another were shucking corn. Deceased does not appear to have
been with him. No language or conversation of appellant is shown.
The court, however, states that this occurred just before the killing.
How long before the killing, or how remote from the place of the kill-
ing, is not otherwise shown in the bill. If the appearance of defendant
was so connected with some act of his which had a bearing on the
homicide as to make it relevant, then it might be shown that at that
particular time he looked pale and haggard. However, we are in-
clined to doubt whether a witness should be permitted to interpret
a pale and haggard appearance as one indicating that appellant "was
troubled some way or another."

The next bill of exceptions involves somewhat the same character
of question. The State proposed to prove and did prove by the wit-
ness Smith the appearance of deceased, under the following circum-
stances: While witness Smith and one King were at the barn at work
on the morning of the homicide, and prior thereto, deceased, Mrs.
Whitesides, came out to the barn; and the witness was asked the fol-
lowing question, to wit: "Did Mrs. Whitesides remain at the barn, or
did she go off somewhere?" He answered: "She stayed there a few
minutes after that, and remarked that she was going to take her
calves." Q. "Did she seem uneasy about anything or not?" Defend-
ant objected to this question on the ground that it called for a con-
clusion, and was misleading and hearsay. The objection was over-
ruled, and the State then asked the question of the witness: "What
was her manner?" To which witness replied: "From the way she
talked, she seemed to be uneasy." This was objected to on the ground
that it was a conclusion of the witness, and when defendant was not
present. With reference to this testimony we make the same observa-
tion heretofore made in regard to the testimony concerning the ap-
pearance of defendant, with this further suggestion: What deceased
was talking about is not shown,—whether about defendant, or con-
cerning some other matter; and her appearance at that time is not
connected with any relevant fact proved on the trial. Moreover, we
do not believe it was competent for the witness to state that deceased
at that time had an "uneasy look." We do not believe this was a mat-
ter of expert testimony. What one might consider an uneasy look,
another might deem a composed or pleasant expression of counte-
nance. This character of evidence is too uncertain to be the subject
of opinion testimony. The evidence admitted, as shown by these two
bills, was of a character calculated, in the minds of the jury, to op-
erate to the prejudice of appellant. The evidence shows that the par-

ties had quarreled the night before, but had made friends, and were apparently friendly at the time the witness testified as to the appearance of the parties. Now, the jury would be liable to consider, as far as the testimony concerning appellant's expression of countenance was concerned, that the reconciliation between him and deceased was merely apparent; that his pale and haggard look, which witness interpreted as indicative of "trouble some way or another," was directed towards deceased; and that his feelings towards her was still secretly hostile. And so with reference to the testimony concerning deceased's expression of countenance, which was interpreted to mean that she was uneasy about something. It may have been considered by the jury to mean that the difficulty was not really settled, and she was then apprehensive that appellant might do her injury. We do not believe that this testimony ought to have been admitted.

The third, fifth, sixth, and eleventh bills of exception present the same general question; that is, each of said bills is an exception to the action of the court in excluding certain testimony showing particular acts of deceased with other parties, having no connection with the homicide. Appellant insists that said acts were admissible, because they showed that deceased was a woman of violent and dangerous character; that such testimony should be admitted on the same ground that proof of the general character of deceased is admissible, and in lieu of, and as a substitute for, such proof; that it was a dispute as to what demonstrations were made at the time of the homicide by deceased, and the testimony was admissible as tending to explain the character of deceased, and the probable truth as to what occurred at the time of the homicide, as related by appellant. It is sufficient to say that these particular acts were in nowise connected with the homicide, were not communicated to appellant, and were not shown to have operated upon his mind, and we do not believe that the court erred in rejecting the same. For a full discussion of this question, see Heffington v. State, ante, p. 315.

Appellant's seventh bill of exceptions complains that the court erred in refusing to permit him to prove by deceased's husband particular acts of the deceased, indicating that she was a violent and dangerous woman; and also, as a part of said bill, appellant proposed to prove by said witness that deceased was a woman quick to anger, and high-tempered; that she could not control herself when she became very mad, but would strike a person, if he had done her an injury. If this be considered evidence of her actual character, it is so intermingled with the testimony of the particular acts of deceased as not to be severable therefrom; that is, the objection as to the whole mass of testimony included this. Moreover, we do not think, as presented, that this can be considered as evidence that deceased was a quarrelsome and dangerous woman. Appellant, however, contends that it is such evidence, and is admissible as tending to corroborate the testimony of appellant as to how the difficulty began; that is, as showing

that deceased, as testified by appellant, was the aggressor in the difficulty. We are advised of no case in this State where it has been distinctly held that evidence of the actual character of deceased is admissible. The authorities, so far as we are advised, confine this character of testimony to evidence of general reputation. Appellant, however, refers us to State v. Lee, 22 Minnesota, 407; State v. Sterrett, 68 Iowa, 76, 25 Northwestern Reporter, 936; Marts v. State, 26 Ohio State, 168. We have examined these cases and each of them is authority to the effect that a witness who knows the actual character of a deceased person can testify to such character, when that kind of evidence is relevant to an issue in the case. It would appear that, where proof of actual character is relevant (that is, tends to solve some issue in the case) the writer of this opinion is inclined to the view that such testimony ought to be admitted. For instance, in a certain character of case, where it is doubtful who began the difficulty, then it would seem that, if deceased had an actual character of being a dangerous and violent man, such evidence ought to be admitted on the same principle that evidence of general reputation is admissible to solve the same question. Or if, in a given case, it becomes an issue whether the defendant acted in self-defense, under the honest belief that he was in danger, then he might testify that he knew his adversary was a dangerous and violent man. Or if some other witness knew this fact, and communicated it to defendant, he ought to be allowed to prove it. This character of evidence is admissible on the general principle that it is admissible to prove any fact, hearsay or not, which goes to explain the condition of a person's mind, when such condition is at issue; and, "whenever the issue is whether one actually believes himself attacked, he can put in evidence any fact that would tend to prove the bona fides of his belief." Whart. on Hom., sec. 606. But, as stated before, the bill does not present the question in a shape in which it can be considered.

Under the bill as presented, especially as explained by the court, we think the testimony of Spangler on cross-examination was admissible, as tending to show how he claimed a half interest in said herd of cattle. The difficulty appears to have originated in regard to these cattle, and appellant's claim of interest in same; and on his original examination, we understand he so testified. This made it competent for the State, on cross-examination, to prove the nature of his claim.

The tenth bill of exceptions shows that while Charley Spangler, a son of defendant, was on the stand as a witness for the State, and after he had testified that on the day of the homicide he came to town with his father, and that as he came to town his father told him that he had shot and killed Mrs. Whitesides; that she had made a gun play at him, and tried to kill him, and he shot her,—thereupon the State's counsel asked said witness if he had not testified before the grand jury, in addition to what he had here testified, as follows: That after she jerked the pistol out of her dress somewhere, and snapped it at him, he then shot her, first in the breast, and that she turned and

grabbed at a knife or butcher knife, and he shot her in the side, to which witness replied that he did not think he had so testified; that he did not remember his father saying anything about a butcher knife. At this juncture State's counsel produced the testimony of said witness taken before the grand jury and insisted on reading said testimony to the witness, and examining him in regard thereto. Counsel for defendant objected to this procedure on the ground that the witness was the State's own witness, and he had not testified to any fact injurious to appellant, and therefore there was no ground to contradict him, and they could not use said testimony for the purpose of impeachment; and, besides, they could not go into the grand jury room for testimony of impeachment. Counsel for the State insisted on reading said testimony to the witness for the purpose of refreshing his memory. Defendant objected because the witness had answered every question promptly; he was not an unwilling witness, and they could read no paper to him for any purpose; that the witness might take the testimony to refresh his memory, but they could not read it before the jury in order to refresh the witness' memory. The court overruled appellant's objections, and allowed the State to read from said testimony to the witness before the jury, for the purpose of refreshing his memory. After his memory was so refreshed, he answered that he recollected his testimony as stated in the evidence before the grand jury; and he then testified his father told him that after she drew a pistol on him, and he shot her, deceased then turned and grabbed at a knife on the table. While this mode of procedure, in thus refreshing the witness' memory, was objectionable, and the proper practice would have suggested, if counsel desired to refresh his memory, to take the witness aside and have him read his testimony, and thus refresh him, yet we can not see how the method adopted was calculated to prejudice appellant, inasmuch as the witness' recollection was refreshed, and he then testified to the facts as stated in his former testimony. Fitzpatrick v. State, 37 Texas Crim. Rep., 20; Rhea v. State (Texas Crim. App.), 38 S. W. Rep., 1012. The position assumed by counsel, that the witness could not be impeached, he not having testified to any fact injurious to appellant, is perfectly sound. But we do not understand from the bill that this was the purpose of the State in reading the grand jury record to the witness. The explanation of the court shows that the grand jury record was not introduced in evidence at all, and was only used to refresh the witness. Of course, it would not have been competent to go into the grand jury room to have impeached the witness, unless his truthfulness on the particular matter had become an issue in the case. Hines v. State, 37 Texas Crim Rep., 339; Gutgesell v. State (Texas Crim. App.), 43 S. W. Rep., 1016. We would, however, observe that the practice pursued here was reprehensible. To illustrate this: If the witness' memory had not been refreshed, and he had refused to testify to the additional facts stated in the bill of exception, which was shown him in his grand jury examination, then the State would, indeed, have been in a predicament.

Charley Spangler was a witness for the State, and he had testified to
no fact detrimental to the State, and the State would not have been
authorized to contradict him by showing that he had testified to an
additional fact before the grand jury. It could only contradict him
where he had testified to some affirmative fact detrimental to the
State, and then only where the attorney for the State had been taken
by surprise at the testimony of his own witness. So far as we are able
to discover from the bill here, the witness did not remember the addi-
tional fact; and the State was permitted, over the objections of ap-
pellant, to parade the witness' testimony, taken in the grand jury
room, before the petit jury trying the case. As stated before, while
this was not a correct practice, and is an indirect method of going
into the grand jury room before the petit jury, without authority of
law, yet, the witness' memory having been refreshed thereby, and he
having answered the question, it is not such error as would authorize
a reversal of this case.

Appellant objected to the charges of the court on manslaughter.
Said charges are found from paragraphs 13 to 17, inclusive, and in
paragraph 20. The ground of objection urged to these charges is to
the effect that same are too restrictive, in that the charge on man-
slaughter confined the jury to the adequate cause occurring at the very
time of the homicide. We have examined the charges on manslaughter
carefully, and in our opinion, the charges do restrict the jury, as to
the act of provocation, to the very time of the homicide. For in-
stance, in subdivision 14 the court told the jury that the provocation
must arise at the time of the killing, and the passion must not be the
result of a former provocation, and the act must be the direct result
of the passion arising out of the provocation at the time of the killing;
that it was not enough that the mind was merely agitated by passion
arising from some other provocation, or a provocation given by some
other person than the party killed. And in subdivision 16 the jury
were further informed by the court that the insulting words of the
person killed, towards the female relatives of the person guilty of the
homicide, was adequate cause, and that any condition or circumstance
capable of creating, and which does create, sudden passion, etc., is
adequate cause; that in order for a killing to be manslaughter, on the
ground of insults to a female relative, it must appear that the same
took place immediately after the insulting words, etc. In subdivision
20 the court simply tells the jury, if they believe defendant was moved
by some adequate cause, at the time of the killing, to such a degree
of anger, rage, etc., as to render him incapable of cool reflection, and
that in such state of mind, and not in his lawful self-defense, he killed
said Mrs. Whitesides, to find him guilty of manslaughter. These are
all the clauses of the charge that have any bearing on the question,
and we fail to find any instruction on manslaughter that authorized
the jury to take into consideration all the facts and circumstances
in evidence bearing on the question of provocation at the time. The
only question for our consideration is, was said charge calculated to

injure or prejudice appellant? If there was no testimony bearing on this issue, aside from the provocation at the time, then the charge was without prejudice; but if there was evidence in the case tending to intensify the provocation given by deceased at the time, as claimed by appellant, then said charge was too restrictive. An examination of the record discloses that appellant testified that at the time deceased called him in the kitchen, after some conversation, she began to abuse and bemean him, applying vile epithets to him, and among other things, she told him that his wife and daughters were whores. An examination of the record also disclosed that this witness and others testified that there was a previous misunderstanding between appellant and deceased; that on Saturday and Sunday before the homicide, they had frequent quarrels and altercations; that on said occasion she abused and bemeaned appellant, cursing him and denouncing him as a black son of a bitch, and that she also stated his wife and daughters were whores, and that she and one of her sons had caught one of his daughters in the act. Now, while, under the charge of the court, the jury could regard the statement alleged by defendant to have been made to him by deceased at the time of the homicide, to wit, that his wife and daughters were whores, yet the effect of the charge was not only to limit them to this provocation, but to cut the jury off from any consideration of similar charges made by deceased to defendant in regard to his wife and daughters, as well as former abuse and vilification of himself by her. While it is true that the provocation must arise at the time, or be so closely connected therewith as not to allow cooling time, and a defendant is not authorized to act on some former provocation, yet as we understand the rule of law and the decisions on that subject, the jury are authorized to look to the acts and conduct of the deceased on former occasions, so far as they may shed light on what occurred at the time of the homicide. Woodring v. State, 34 Texas Crim. Rep., 419; White v. State, 34 Texas Crim. Rep., 153; Bracken v. State, 29 Texas Crim. App., 362. Unquestionably, the previous denunciation of appellant's wife and daughters as being whores would serve to aggravate and intensify the denunciation of them as such at the time of the homicide. Yet, under the charge of the court, the jury were restricted from taking into consideration such testimony. We believe that defendant was entitled to have a full and fair charge authorizing the jury, in determining whether or not the adequate cause existed at the time of the homicide, to take into consideration all the facts and circumstances in evidence bearing on that issue; and, as we understand it, the charge in question cut them off from, and was a limitation on, this right, and, as such, it might have worked material injury to appellant's rights. The judgment is accordingly reversed and the cause remanded.

*Reversed and remanded.*