C. W. ROBERTS v. THE STATE.

No. 13665.   Delivered January 28, 1931.

The opinion states the case.

*Burch & Woodruff,* of Decatur, *Hood & Shadle,* of Weatherford, and *J. V. Patterson,* of Decatur, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, Presiding Judge.—The offense is murder; penalty assessed at confinement in the penitentiary for a period of twenty-two years.

On the morning of May 14, 1929, the wife of the appellant was killed. She, the appellant, and a small child were in the woods at a point some distance from their dwelling. From the State's testimony, as developed from neighbors who were attracted to the scene by the report

of the gun and the outcry of the appellant, the following in substance appears:

Lloyd Fitzgerald, one of the witnesses introduced by the State, on direct examination gave testimony to the effect that the appellant and his wife were known to the witness; that they were neighbors. Upon hearing a shot and the appellant hollering, the witness went to the scene of the tragedy which occurred in a creek. The only persons present at the time were the appellant, his little boy and the deceased. The deceased was lying on the bank of the creek. The appellant was standing about three feet from her head. He was crying and hollering. He said to the witness: "I was fixing to shoot a squirrel up in that tree and backed off into that little drain and fell and the gun went off and shot her." Appellant illustrated to the witness the position of the parties at the time the tragedy occurred. The witness paid scant attention to the place at the time but was later called back by officers. However, he assisted in moving the body of the deceased.

Another witness who arrived later gave testimony and related the locality of the parties and the declarations of the appellant.

Appellant testified in his own behalf. He was 45 years of age, had been married but once, and had lived in Wise County for something like twenty years. His wife had been married but once. They had four children, two of whom were dead. Of those living, the youngest was five years of age at the time of the trial and the other eleven years old. The appellant, his wife and the little boy had been out hunting on the previous day in the same neighborhood and had killed several squirrels. He was using a shotgun. Two squirrels had been killed at the time of tragedy. Appellant described the locality in which the tragedy occurred and referred to a little drain. Thinking that he saw a squirrel in a certain cottonwood tree, he indicated to his wife and son that he wanted them to stop as he could not shoot the squirrel from his position. The deceased said that she would go around and turn the squirrel for him. From the appellant's testimony we quote: "I stepped back to get a better view and as I did so, I stepped back into the hole, and the gun went off and killed her. * * * I couldn't say whether the gun went off as I stumbled, or as I fell, or after I had hit the ground."

The State's theory was murder, and the appellant's theory was accidental homicide.

On the day of the tragedy the assistant district attorney, several officers, and perhaps others, went to the scene of the tragedy. The appellant was in their company. In great detail the locality and surroundings were described by the assistant district attorney and the officers who were with him, by the reproduction of some of their testimony and by photographs taken upon the ground. There was introduced in evidence

the bonnet which was upon the head of the deceased at the time she was killed.

The statement of facts is quite voluminous, containing 220 printed pages. It is neither practical nor desirable to quote the testimony in detail further than necessary to illustrate such legal questions as call for review.

Touching the motive for the killing the State introduced the witness Sheppard, whose testimony was in substance as follows. About ten months preceding the homicide, at a picnic at Booneville, a conversation took place, which the witness related as follows: "It seemed like to me Mr. Roberts was kind of worried about something, I thought. He told me his wife is jealous of him and accused him of lot of things he doesn't do. He says, 'I have got a lot of trouble,' and said, 'If it wasn't for my two little boys, and had what I have in money, I would leave out there.' * * * He said he had been living in Hell for twenty-five years."

Sheppard was vigorously cross-examined and his testimony on the previous trial of the appellant, at which time the witness fainted from fright, he said, was read into the record. Among other things, appellant took the position that the occasion to which Sheppard referred in which the alleged conversation took place, was when the witness was drunk. This was denied by him and other witnesses, including his wife, who testified that she was with Sheppard and the appellant at the time the conversation is alleged to have taken place but that she did not hear the talk with Mr. Roberts, the appellant, that night because she could not hear good. The declaration by the appellant was controverted by his testimony and by the testimony of others tending to show that Sheppard was drunk on the occasion mentioned by the appellant.

The witness McNeil testified that on a certain occasion (about three months before the homicide), while he and the appellant were engaged in driving some cattle, a conversation took place in which the appellant made in substance the following remarks: "He told me if things didn't change he was going to kill her; I don't think he said just exactly how he was going to do it; he said he could get by with it by killing some squirrels down on the creek."

Appellant denied making the remarks and introduced testimony tending to show that on the occasion mentioned by him McNeil was under the influence of intoxicating liquor. The State introduced testimony combatting the appellant's theory that McNeil was drunk at the time referred to above. The State also introduced the testimony of a number of witnesses supporting the general reputation of McNeil for truth and veracity. Against such evidence the appellant interposed timely objection and brings the matter before this court for review. Appellant's counsel propounded to McNeil a number of questions on cross-examination which are set out under the sanction of the court in question and answer form

in a bill of exception. He denied that he possessed whisky on the occasion or had been drinking. He also denied that upon that occasion, in the presence of Roy Richardson and Lon Heartsill, on the suggestion that his conduct was likely to lead to his arrest, he said that he was not afraid of officers and used abusive terms; that he stated that out in New Mexico some came to his wagon and that he shot three of them during an argument; that out there he was called "Red" McNeil. The bill shows also that Roy Richardson testified in behalf of the appellant that he was present and heard the remarks mentioned; also that he saw McNeil at the time he and the appellant were driving the cattle mentioned and that he (McNeil) was drunk.

The appellant also introduced the witness Heartsill who testified that on the day the cattle were driven to Bridgeport, he saw both McNeil and the appellant; that McNeil was cursing and bore evidence of drinking; that in the course of his remarks McNeil said that he was not afraid of officers; that out in New Mexico some officers came to his wagon and he shot three of them during an argument; that he was called "Red" McNeil out there.

The bill of exception recites the following: "And be it it further remembered that this was all of the evidence introduced by the defendant on this trial with reference to the witness, L. A. McNeil; and be it further remembered that on the trial of said cause that no evidence was introduced or offered to be introduced by the defendant touching or concerning the general reputation of the said witness, L. A. McNeil, for truth and veracity; and be it further remembered that on the trial hereof no question was asked by counsel for the defendant as to the general reputation of the witness, L. A. McNeil, for truth and veracity; and be it further remembered that at no time during the trial of the above entitled and numbered cause the defendant's counsel proved or offered to prove that the said witness, L. A. McNeil, had ever been charged with any offense whatever; and be it further remembered that at the trial of the above entitled and numbered cause the said witness, L. A. McNeil was not a stranger in said Wise County, Texas, the county of said trial and was not a non-resident of said county but in fact resided in said Wise County, Texas, and had so resided in said county for some three years prior to said trial."

That the accuracy of recollection of events or transactions is impaired by intoxication, or that it at least tends to impair it, is generally recognized. See Corpus Juris, Vol. 23, Sec. 1770. The impaired condition of the mind, either from a temporary cause, such as intoxication, excitement, fright, physical pain, or from the infirmities of old age or other infirmities, is deemed a proper subject of inquiry by the court for the consideration of the jury in weighing the testimony of individuals. It is not deemed sound to conclude that the temporary mental impairment

which may confuse the mind of an individual would be an impeachment of moral integrity before or after the temporary impairment had ceased. The circumstances under which proof may be made of the general reputation of a witness have often been considered by this court. Such proof is available to support a witness when attacked but is not ordinarily made available by contradiction. See Branch's Ann. Tex. P. C., p. 115, Sec. 184, and authorities cited, including Britt v. State, 21 Texas App., 221, 17 S. W., 255; Graham v. State, 57 Texas Crim. Rep., 109, 123 S. W., 691.

Adverting to the question here presented touching the witness McNeil, the testimony appears to have been addressed to the question of his mental condition, that is, as to whether he was drunk or not. Upon that issue there is a conflict of evidence but apparently not an impeachment of the witness in the sense that it would open the door to proof of his general reputation. The reference to his declaration that he had shot some officers in New Mexico seems to have been in connection with his acts and conduct bearing upon his lack of sobriety. It was at the very time of the cattle-driving trip introduced by the State and in which it is claimed that the threat was made by the appellant. In a sense the condition of McNeil and the physical evidence of it were a part of the res gestae of that occurrence. The fact that he was boastful and boisterous and that his conduct was such as to indicate that he was drunk was relevant, but upon that issue the declaration imputed to him does not purport to show that he had been prosecuted for any criminal act or conduct. If the appellant's attempt had been to introduce proof of the specific act of shooting officers by McNeil as an impeachment of him, it would have been excluded upon objection by the State as an attempt to impeach the witness by proof of his specific act wholly collateral to the issues on the trial. See Branch's Ann. Tex. P. C., Sec. 168; McAfee v. State, 17 Texas Crim. App., 139, and other cases collated. Under such circumstances, if the State waived its objection it could not make the improper introduction of it a reason for introducing proof of the reputation of the witness. See Surrell v. State, 29 Texas Crim. App., 321, 15 S. W., 816. The conduct of McNeil described by the witnesses took place at Bridgeport while he was in company with the appellant on the very occasion on which McNeil claims that appellant made the threat against his wife to which McNeil testified. McNeil and the appellant were in a restaurant. The witness Heartsill entered and observed McNeil, who was cursing and boisterous. The witness said: "Mr. Roberts was trying to quiet him. I could see he was drinking. I thought he was just a drunken guy and didn't bother much with him. I told him he had better not go out on the street as the officers would arrest him. McNeil said that he wasn't afraid of the 'damned bastards.' * * * He said, 'I am not afraid of

them. Out in New Mexico some came up to my wagon and I .shot three of them during the argument. I am called "Red" McNeil out there.' * * * In the restaurant this man would sit up and lean over to the side, and his eyes were red and blood-shot. His face was flushed and I could smell liquor on him. As he went out of the restaurant I held his arm to steady him. When I loosened my hold he stumbled. I got hold of him and carried him to the back end of the counter and walked on out. I asked him what he was drinking and he told me what he was drinking. I asked him if he had any left and he said, 'No, I had a half gallon down at the stockyards this morning, and it's all gone.' "

The bonnet worn by the deceased at the time of the homicide was introduced in evidence, and in the back part of it is a round hole about one and one-half inches in diameter which was made by the discharge of a shotgun while the bonnet was on the head of the deceased. There was also introduced on behalf of the State testimony touching some experiments made with three pieces of cloth of a fabric substantially the same character as that of the bonnet, and the gun used by the appellant being fired at the fabric targets at various distances. The bonnet and pieces of cloth accompany the record. One exhibit represents a piece of fabric at which the gun was fired at a distance of 15 feet. It made a hole in the fabric about one inch in diameter and with some scattered shots around the hole. The other exhibit represents a shot fired with the muzzle of the gun at a distance of 17 inches from the fabric, making a hole in the fabric of about the same dimensions just mentioned but with no scattered shots. The fabric contained some' powder burn. Another exhibit represents a cloth showing impressions of a gun fired at 12 inches, 18 inches and 36 inches. At 12 inches, the hole is about three-fourths of an inch in diameter and surrounded by powder burns. At 18 inches, the hole is substantially like that at 12 inches. At 36 inches, the hole is about three inches long and about one inch wide without powder burn or scattered shot surrounding it. From the bill of exception it appears that the evidence showed that the distance between the body of the deceased and the appellant at the time the gun was fired was 11½ feet; that the bonnet was upon the head of the deceased; that pieces of cloth were hung loosely on brush and the gun fired at various distances. The evidence of the result of the experiments is not deemed to have been admissible. Experiments similar in their nature to the original transaction are regarded admissible in evidence if they are made under similar conditions and tend to elucidate some contested issue. Clark v. State, 38 Texas Crim. Rep., 30, 40 S. W., 992; Wharton's Cr. Ev., Vol. 1, p. 610; Morton v. State (Texas Crim. App.), 71 S. W., 281; Reagan v. State, 94 Texas Crim. Rep., 468, 208 S. W., 523. In the present instance, the experiments do not appear to have been made under like or similar conditions with the original and do not, so far as this

court can comprehend, illustrate any controverted issue. The evidence that the deceased was killed by a gunshot wound from the appellant's gun is conclusive; that she wore a bonnet through which the shots passed and made a hole is likewise conclusive. The piece of cloth placed fifteen feet from the muzzle of the gun is unlike the others in that it is surrounded by some scattered shot. None of the recitals in the bill place the muzzle of the gun at the time it was shot by the appellant at a distance of fifteen feet from the deceased. The other impressions on the pieces of cloth are not materially different from those upon the bonnet, except that the bonnet shows no powder burns. The experiments made by hanging the pieces of cloth upon some brush are manifestly dissimilar from the bonnet upon the head of the deceased. We think the evidence was improperly received.

The request to instruct the jury on the law of circumstantial evidence was properly refused. The State did not rely upon circumstantial evidence alone but relied upon the declarations of the appellant. Some of them were res gestae and uttered a few moments aftr the fatal shot was fired and while the deceased and the appellant were still at the scene of the tragedy. These declarations were introduced by the State. In them the appellant avowed that the deceased was killed by the discharge from his gun. In the same declarations he explained the circumstances of the killing. These exculpatory declarations, if true, would establish the innocence of the accused. On the subject, the only instruction given to the jury was the following:

"You are further charged that as a part of the law in this case that when the admission or confession of a defendant are introduced by the State, then the whole admission or confession are to be taken together, and the State is bound by them unless they are shown to be untrue by the evidence; such admissions or confessions are to be taken into consideration by the jury as evidence in connection with all the other facts and circumstances of the case.

"The defendant in this case claims that the killing of his wife, ELLA ROBERTS, was not done by him intentionally, but was done accidnetally. If you believe from the evidence that the defendant killed his wife, but further find that said killing was accidental, or if you have a reasonable doubt thereof, you will acquit the defendant, and say by your verdict 'not guilty'."

Against this there were exceptions addressed to the charge. The charge, as framed, may have left upon the minds of the jury the impressions that the "admissions and confessions" meant the *inculpatory* part of the declarations of the appellant. The object of such a charge is to advise the jury that the exculpatory part of such declarations is to be regarded as true unless disproved. See Pharr v. State, 7 Texas App., 478.

In other bills of exception it is claimed that the verdict was reached

by lot and that the application for a continuance was improperly refused. These matters have not been discussed as they are not likely to occur on another trial.

We have given attention to the record and have discussed such other questions raised as are deemed likely to occur upon another trial.

Regarding the errors to which reference has been made substantial and fraught with injury to the accused, the judgment is reversed and the cause remanded.

*Reversed and remanded.*