LOUIS KEY v. THE STATE.

No. 23249. Delivered January 9, 1946.
Rehearing Denied March 6, 1946.

The opinion states the case.

*Cox & Cox*, of Sherman, for appellant.

*Olan R. Van Zandt*, County Attorney, and *George T. Avery*, *H. A. Lampman*, Assistant County Attorneys, all of Sherman, and *Ernest S. Goens*, State's Attorney, of Austin, for the State.

HAWKINS, Presiding Judge.

Appellant was convicted of the murder of Paul Gatewood, and his punishment assessed at 10 years in the penitentiary. Both parties were negroes.

The killing occurred at Gatewood's house, and was the aftermath of a "crap" (dice) game. The State's evidence in the main

came from Lizzie Akers who was Gatewood's paramour with whom she had been living for some five years. Her testimony was that Key came to the house between one and two o'clock at night, waked up her and Gatewood and insisted on Gatewood shooting dice. Gatewood won some money from Key and the latter then put his jacket into the game for $4.50 and lost that, then asked Gatewood to allow $5.00 more on the jacket which he did, and Key lost that $5.00, and then wanted to put his shoes into the game, which Gatewood declined, saying "he never took a man's shoes so he would have to go barefooted." Key then wanted Gatewood to take Key's pistol into the game and when Gatewood asked how much he wanted on it Key started shooting Gatewood, who was saying, "Don't shoot." Gatewood ran out of the house, followed by Key, who was shooting at Gatewood as he ran off the porch. Gatewood ran into a neighbor's yard where he fell mortally wounded, and died almost immediately.

Key's account of his presence at Gatewood's house and the cause and manner of the killing is in sharp conflict with the Akers woman's version. Key testified that Gatewood came to his (Key's house) on the evening of the killing and asked him to come to Gatewood's house and gamble; that he declined, but later met Gatewood on the street when the invitation was repeated and he went with Gatewood to the latter's house and they engaged in a "crap" game; that Gatewood won $15.00 and then he (Key) put his coat in the game for $10.00 and while they were gambling for it he caught Gatewood cheating and accused him of it and told him he ought to give back what he had won; that Gatewood denied cheating, and said, "Damn you, nigger, I'll let you have this," or "I'll give up what's under the bed," and reached under the bed, and believing from the words and acts of Gatewood that he was going to kill him (Key), he commenced shooting. He asserted that he only shot two or three times and that each time Gatewood was reaching under the bed. He denied that he fired any shots on the outside of the house while Gatewood was fleeing.

In rebuttal the State called as a witness Luella Boyd, who lived next door to Gatewood. Her testimony sharply challenged Key's account of the killing. She testified that on the night of the killing a negro man knocked on her door sometime after twelve o'clock, and asked if Gatewood lived there, and was told by her that he lived next door. He went to Gatewood's house and she heard him knock on the door there, and then saw a light in Gatewood's house. She continued, as follows:

"I didn't go back sound asleep but kind of dozed off. In about 30 or 40 minutes I heard some gun shots and it woke me up. I jumped up and went to the door and a man was coming off the porch and he shot at Paul (Gatewood). Lizzie was crying and hollering. The person I saw coming off the porch was the same person that I had seen come up to my house at the door, only he didn't have any jacket. He was the same height, and the same person who come to my porch. Paul was running. He was out in the street and this fellow was coming off the porch and Paul was on the street, and this fellow shot and went down west on Brockett Street. When this guy came to the street, he fell, and then he got up and he fired again at Paul, and Paul ran straight on, angling toward Durham's house. I heard two shots. I saw the fire from the gun on two occasions. It was about one o'clock or a little after when I heard the shooting and went outside, * * *"

In bill of exception number one complaint is made of the court's action in denying continuance because of the absence of Anthony White. Appellant's application for continuance appears to be fatally defective in two particulars. It was based upon the absence of four witnesses. The application shows that on May 16 the case had been set down for trial on May 28; that on May 22 a request was filed with the District Clerk asking that process be issued for the named witnesses "except Anthony White and Joe Wilson;" that process was issued and served upon the two witnesses for whom process was requested. Nowhere in said application for continuance is it stated that process was ever issued or requested for White or Wilson. It is stated in the application that if present White would testify that in 1939 or 1940 he and several others were engaged in a dice game in Sherman, Texas, with Gatewood and that he started an argument and procured a large brick or rock and struck White in the head, rendering him unconscious and causing him to remain in the hospital several days. It was also stated in the application for continuance that appellant "verily believed" that Wilson was present and engaged in the same dice game and if in court would testify to the same thing as would White.

We quote from Branch's Ann. Tex. P. C., Sec. 2094, p. 1175. "If self defense is an issue, defendant may prove anything known to him prior to the homicide about deceased as going to show why defendant acted. Proof of specific acts of unlawful violence committed by deceased on others is admissible, if defendant knew of them prior to the homicide, to show who was probably the aggressor, and to show the state of mind of de-

fendant, and to shed light upon the standpoint of defendant at the time of the homicide. Russell v. State, 11 Texas App. 288; Brunet v. State, 12 Texas Crim. App. 521. Childers v. State 30 Texas App. 160; 16 S. W. 903. Skaggs v. State, 31 Texas Crim. Rep. 564; 21 S. W. 257. Poer v. State, 67 S. W. 500. Spangler v. State, 41 Texas Crim. Rep. 430; 55 S. W. 326. Crow v. State, 48 Texas Crim. Rep. 420; 88 S. W. 814. Spencer v. State, 59 Texas Crim. Rep. 225; 128 S. W. 122; Smith v. State, 148 S. W. 699. Jones v. State, 153 S. W. 310. Hysaw v. State, 155 S. W. 941."

One of the later cases upon the subject is Beckham v. State, 133 Tex. Cr. R. 206, 109 S. W. (2d) 764. It is noted that nowhere in the application for continuance was it shown that Key would claim that he acted in self defense, and had knowledge before the killing of the specific act of violence which it was claimed White would relate if present as a witness. The State contested the application for continuance, during which it was developed that in fact process had been issued for both White and Wilson and that both of them had been served, and that Wilson was present in court. The court acted properly in denying the continuance. Upon the trial Key did claim to have acted in self defense, and testified that before the killing he had information about Gatewood's act of violence towards White. Complaint of the denial of continuance was urged as one ground of the motion for new trial. It is appellant's contention that irrespective of whether the denial of continuance was proper, in view of the evidence upon the trial, the court should have granted a new trial because of the absence of the witness White. Reliance is had upon the latter part of subdivision 6, of Art. 543, Vernon's Ann. C.C.P., which provides that: "* * * If an application for continuance be overruled, and the defendant convicted, if it appear upon the trial the evidence of the witness or witnesses named in the application was of a material character, and that the facts set forth in said application were probably true, a new trial should be granted, * * *" We are referred to the many cases cited in Note 35 under the article mentioned in Vernon's Ann. Tex. C. C. P., Vol. 1, and to Branch's Ann. Tex. P. C., Sec. 319, p. 188.

In determining whether a new trial should be granted the trial court may properly take into consideration all of the evidence heard and the incidents of the trial. It is observed that the witness Wilson, though present, was not called by appellant to testify. Furthermore, the continuance was denied on May 28, and the case did not go to the jury until May 30. White lived

in Sherman where the trial was had. When it was discovered that he was absent no additional process was requested for him, and there is no showing made that such process would have been useless. The amended motion for new trial was not filed until June 6. It contains no affidavit from White as to what his testimony would have been, and no reasons appear for its absence. It is not thought that under the facts and circumstances here present it can be properly held that the trial court committed error in refusing a new trial.

Complaint is brought forward in bill of exception number two because the witness Taylor, an officer, was not permitted to testify about an act of violence towards him by Gatewood. This was properly excluded. It is not claimed that Key knew of such incident prior to the killing.

Appellant had proved by George Campbell, a former peace officer, that Gatewood's general reputation was that of a violent and dangerous man. Appellant then sought to prove by this same witness that he had heard of Gatewood knocking White in the head over a dice game, and also that witness knew of other officers having trouble with Gatewood. Upon objection what witness had heard was properly excluded. Appellant could not by hearsay prove that the incidents had occurred. Beckham v. State, 133 Tex. Cr. R. 206, 109 S. W. (2d) 764, cited in support of appellant's contention is not thought to be in point.

What has just been said regarding bills of exception numbers three and four also disposes of bill of exception number five. It is not shown that Key had information about any of these claimed acts of violence save the incident regarding White.

The State's witness, Lizzie Akers, had testified that Key's pistol was "stuck in his belt" and that she had seen it before the shooting. Key testified on direct examination that his pistol was in a paper sack wrapped in a shirt and pair of trousers and was inside his shirt which he was wearing, and that the handle of the pistol was sticking out of the package. Key was recalled for further cross-examination. He was handed the pistol, a shirt, and pair of trousers, and was asked to wrap the pistol as he claimed it was at the time of the killing, place it in the bosom of his shirt and demonstrate before the jury the manner of the shooting, the prosecuting attorney taking the part of Gatewood. The demonstration was objected to upon the ground that the shirt and trousers used were not the same the pistol was claimed to have been wrapped in at the time of the

killing, and that the paper used was not a paper sack; therefore, the experiment or demonstration was not made under the same or similar circumstances as existed at the time of the killing. The objection was overruled and appellant brings complaint forward in bill of exception number six. It appears from the bill that Key tore off a part of the paper and formed the remainder like a sack. He testified, "The pants are larger. The package on that night was a little smaller, but it was wrapped something similar. There is much difference between this package and my package." It does not occur to us from the recitals in the bill that there was sufficient dissimilarity to make the evidence inadmissible. The case of Turman v. State, 50 Tex. Cr. R. 7, 95 S. W. 533, relied on by appellant, was in effect overruled upon the point involved in Long v. State, 120 Tex. Cr. R. 373, 48 S. W. (2d) 632. In Faulkner's case, (43 Tex. Cr. R. 311, 65 S. W. 1093) in passing upon a demonstration before the jury of pouring turpentine upon woolen goods, setting them on fire, and then attempting to extinguish the fire, this court said: "It was not a transaction testified about by any witness, but merely a spectacular exhibition before the jury, and as such was not admissible." Here the witness was testifying and had been called upon simply to show the jury how the killing was accomplished according to his version. In Morton v. State, 43 Tex. Cr. R. 533, 67 S. W. 115, and Roberts v. State, 117 Tex. Cr. R. 418, 35 S. W. (2d) 175, also cited by appellant, the evidence held to have been inadmissible were experiments outside the court room and not under sufficiently similar circumstances to be admissible. In addition to what has been said we observe nothing in the bill which indicates that the result of the demonstration was harmful to Key; so far as the bill shows the result may have been in accord with his version of the killing. Supporting the State's contention that the court committed no error in the matter complained of, see Stembridge v. State, 94 Tex. Cr. R. 207, 250 S. W. 180.

We have examined bills of exception numbers seven and eight. They appear upon their face not to be meritorious, hence the same are not discussed.

Appellant requested the court to exclude the testimony of Luella Boyd heretofore set out, upon the ground that it was hearsay, and complained of the court's refusal in bill of exception number eleven. Appellant's position in the matter appears to be based upon a recital in the bill "That she knew the defendant when she saw him. That the man who knocked on her door was not the size of the defendant. That she could not say

that the man who knocked on her door was the defendant." The bill is approved with the following qualification. "* * * Luella Boyd testified before the court that the man who knocked on her door was the same man who came off the porch that night. She testified that she saw the man who knocked at her door come off the porch that night shooting at the deceased. She further testified that the defendant sitting in the court room was about the same height as the person who knocked at her door that night, and that the person who knocked at the door was a colored man. She also testified that in about 30 or 40 minutes she heard some gunshots and it woke her up. That she jumped up and went to the door and a man was coming off the porch and he shot at Paul. All of this I considered sufficient to permit her to testify about someone knocking on her door and for the jury to pass on." In view of the qualification the court's action is not thought to have been erroneous.

Appellant objected to paragraph 12 in the court's charge, which was the converse of the instruction upon the law of self-defense. In Whitaker v. State, 146 Tex. Cr. R. 325, 174 S. W. (2d) 975, an instruction in almost identical language was held not to have been erroneous.

Bill of exception number nine reflects that appellant requested the court to instruct the jury that if he once commenced to shoot in order to save his life or to prevent serious bodily injury to himself, he would have the right to continue to shoot as long as there was an appearance of danger to himself from such threatened assault. The court declined to give such special charge with the explanation that appellant's right of self defense was in no way limited in the main charge. No point was made that any particular shot caused the death of Gatewood. Appellant relies on the statement in Branch's Ann. Tex. P. C., Sec. 1968, p. 1108, and cases therein cited, in support of his right to have the requested charge given. From an examination of those cases the general rule is plain that when the facts call for such an instruction it should be given. Some difficulty arises in making application of the rule under the facts of particular cases. Swain v. State, 48 Tex. Cr. R. 104, 86 S. W. 335, is a good example of facts calling for such a charge. We have been unable to discover the evidence either from appellant's or State's witnesses requiring such instruction in the present case. Appellant claimed to have fired no shots while Gatewood was running from his own house to escape from appellant; no claim that appellant saw any weapon in Gatewood's hands, nor that it appeared to appellant that Gatewood was seeking a point of

vantage from which to renew the claimed threatened assault. The State's witnesses make out a case showing that appellant commenced to shoot Gatewood in the house, and followed him into the yard, continuing to shoot as Gatewood was trying to escape, entreating appellant not to kill him.

Believing no reversible error was presented, the judgment is affirmed.

### ON APPELLANT'S MOTION FOR REHEARING.

DAVIDSON, Judge.

In his motion for rehearing, appellant insists we erred in reaching the conclusions expressed.

No new or different propositions are presented.

Te entire record has been re-examined. We remain convinced that reversible error is not reflected. No useful purpose would be served to write further.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.